# Illinois Official Reports

## Appellate Court

---

### *In re N.T.*, 2015 IL App (1st) 142391

---

| | |
|---|---|
| Appellate Court Caption | *In re* N.T., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Arielle T., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2391 |
| Opinion filed | February 20, 2015 |
| Opinion withdrawn | April 6, 2015 |
| Modified opinion filed | April 10, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from an order terminating respondent's parental rights to her four-year-old daughter, the termination of her rights was affirmed where the trial court's finding that the termination was in the child's best interest was not against the manifest weight of the evidence, and, furthermore, respondent was not denied a fair hearing where respondent's mother was properly informed by the trial court that adoption was favored over guardianship, that the juvenile court was not acting as an advocate by asking respondent's mother "damaging" questions during the best interest hearing, including questions eliciting her opinion that she was the *de facto* parent of respondent's child, and respondent was not entitled to a fitness hearing prior to the termination proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-01122; the Hon. Maxwell Griffin, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Eileen T. Pahl, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain, Janet L. Barnes, and Jenetia M. Marshall, of counsel), guardian *ad litem*.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from the juvenile court's entry of an order terminating respondent Arielle T.'s parental rights to her daughter, four-year-old N.T. Respondent argues that the juvenile court's decision was against the manifest weight of the evidence and that she was denied due process by the juvenile court's actions during the termination proceedings. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3    Respondent's daughter, N.T., was born on December 24, 2010. On December 28, 2010, the State filed a petition for adjudication of wardship, asking for N.T. to be adjudicated a ward of the court; the State also filed a motion for temporary custody the same day. The adjudication petition claimed that N.T. was neglected in that she was a minor under 18 years of age "whose environment [was] injurious to her welfare." The petition listed the following facts as support for the claim:

> "Mother has one prior indicated report for substantial risk of physical injury/environment injurious to health and welfare by neglect. Mother has one other minor who was in DCFS care and custody with findings of abuse and neglect having been entered. On or about November 30, 2010[,] mother was psychiatrically hospitalized due to acute psychosis and recurrent episodes of paranoia. Mother has been diagnosed with schizoaffective disorder. Mother was non-compliant with her psychotropic medication prior to being hospitalized. Mother has a history of psychiatric hospitalizations and non-compliance with treatment. Medical personnel state mother is unable to parent this minor due to her mental health issues and non-compliance. The identity and whereabouts of putative father are unknown."

¶ 4     Also on December 28, 2010, the Department of Children and Family Services (DCFS) investigator assigned to N.T.'s case filed an "Affidavit Documenting DCFS Efforts," which stated that this case came to the attention of DCFS on December 24, 2010, when respondent gave birth to N.T. Respondent had been admitted to the psychiatric unit of the University of Illinois Hospital in Chicago due to acute psychosis on December 17, 2010, and refused prenatal treatment. When N.T. was born, Dr. Wilmarie Garcia took protective custody of the child "due to mother[']s inability to parent her new born baby."

¶ 5     Based on the facts alleged in the State's petition for adjudication of wardship, on December 28, 2010, the juvenile court found probable cause that N.T. was neglected and that immediate and urgent necessity existed to support her removal from the home. The court granted temporary custody to the DCFS guardian administrator with the right to place N.T. At the hearing, the juvenile court was informed that N.T. would be placed with Deirdra T., her maternal grandmother, who was present in court. The court then addressed Deirdra:

"THE COURT: When we place children, one of the things we try to find is a relative placement. But we need that relative to understand that while we hope to be able, once we bring a child into the system if we can't avoid that, we hope to be able to return the child to the natural parent.

But should return home fail for any reason, we ask foster parents, whether they be relatives or not, to do a very difficult thing: One, they should be supportive of the return home goal. Two, should return home fail for any reason, they should be prepared to provide permanency and stability for the child.

On a child this young, the first thing the Court's going to look at is adoption, okay? So you need to be aware of that. And when we look at this, we look at it in the best interest of the child. We don't simply say well, I don't want to change the family dynamic is not something that will necessarily keep the Court from terminating parental rights and making the child available for adoption, because the priority is to put the child in a stable and permanent home, to give him or her that security.

And what we've found is with private guardianship, a private guardian at any time for any reason can come back to the Court, and they do, and say I don't want to be the guardian anymore, and then the child is back in flux.

So I have to have a reason to rule out adoption, and a relative simply not wanting to take that step is not a good reason.

So I'm not suggesting at this point I'm making any judgment as to how this is going to go. Hopefully your daughter will make progress with services, remain medication compliant, if that's what she needs to do, and can be a parent for this child.

But if she can't, I'm going to be looking to, you know, put the child in a permanent situation. Now even terminating your daughter's parental rights and having you adopt the child, in essence, it will probably–it will legally change the child's status, but in reality, you're always going to be the mother's mother, and you're always going to want that child to know that.

And that's the reality that I deal with when I make these decisions. But I want you to be aware of that from the very beginning, because oftentimes in the effort to look for relatives that will take the child, these things aren't discussed with them all the time,

and they're under the misconception that they have the option to just say well, okay, I'll do private guardianship, and that's not necessarily the case. Okay?

DEIRDRA: Yes."

On the same day, the juvenile court entered an order granting respondent visitation limited to day visits supervised by a DCFS or private agency caseworker.

¶ 6 On March 25, 2011, the juvenile court entered an order finding N.T. neglected due to "injurious environment." The same day, the court entered a disposition order making N.T. a ward of the court and finding respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline her. The court further found that reasonable efforts had been made to prevent or eliminate the need for removal of N.T. from her home, but that it was in the best interest of N.T. to remove her from the custody of respondent. The court placed N.T. in the custody of the DCFS guardianship administrator with the right to place her. Respondent appealed, and we affirmed the juvenile court. *In re N.T.*, 2011 IL App (1st) 111083-U (summary order).

¶ 7 On July 13, 2011, a permanency order was entered, setting the permanency goal as return home within 12 months. The order indicated that respondent had made substantial progress toward the return home of N.T. The reasons for selecting the goal were listed as: "[N.T.] is 6 months old and placed in a pre-adoptive home. All of [N.T.'s] medical and clinical needs are being met. [N.T.] is doing well. Mother has a mental health disorder and on medication. Mother in therapy and making progress. Mother referred for a parenting assessment evaluation. Mother cooperating with 2x a month drug drops and last tested positive for marijuana in March 2011. Mother has daily visits with [N.T.] Father unknown. He is not visiting and not in services."

¶ 8 On February 21, 2012, a permanency order was entered, again setting the permanency goal as return home within 12 months and stating that respondent had made progress toward the return home of N.T. The reasons for selecting the goal were listed as: "[N.T.] is one year old and lives in a relative pre-adoptive foster home. [N.T.] completed a 0-3 evaluation in November and is not in need of services. Natural mother is engaged in services and is visiting [N.T.] A parenting assessment was conducted in November."

¶ 9 On November 19, 2012, a permanency order was entered modifying the permanency goal to substitute care pending court determination on termination of parental rights. The reasons for selecting the goal were listed as: "[N.T.] is almost 2 years old and placed in a pre-adoptive relative home. All of [N.T.'s] medical, educational and clinical needs are being met. Mother is involved in services but not making progress. Agency has suspended all visits between the mother and [N.T.] due to mother's behaviors. Father not involved in services and not visiting [N.T.] The court has reviewed CCJCC report." The "CCJCC report" referenced in the permanency order was a Cook County Juvenile Court Clinic report submitted in response to a request for clinical information. The report was completed on October 30, 2012, by Dr. Heather Cintron, a licensed clinical psychologist, and included respondent's "protective factors and parenting strengths," as well as her "risk factors and parenting weaknesses." The report noted that "[m]inimal protective factors have been identified" due to respondent's "mental health instability and expression of psychotic behaviors/ideations," but listed respondent's satisfactory progress on her service plans and the fact that she had not returned a positive substance abuse screening since March 2011 and was compliant with substance abuse services. As risk factors, the report listed respondent's long history and current expression of

mental illness, her extensive history of medication noncompliance, her lack of support system, her "significant difficulties with regard to her judgment and problem solving skills" and "history of dangerous and threatening behavior," and her apparent lack of emotional connection to N.T. The report concluded that the likelihood that respondent would be able to make the gains necessary to achieve a goal of return home was "extremely low, as her mental illness is chronic and she has displayed a long history of treatment noncompliance."

¶ 10     On May 17, 2013, another permanency order was entered, again setting the permanency goal as substitute care pending court determination on termination of parental rights. The reasons for selecting the goal were listed as: "[N.T.] is 2½ years old and placed with maternal grandmother in a pre-adoptive home. All of [N.T.'s] medical, clinical and educational needs are being met. Mother has a DSM-IV diagnosis and not in mental health services. Mother has sporadic supervised visits with [N.T.] Father not in services or visiting [N.T.]"

¶ 11     On June 19, 2013, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption (termination petition). In its petition, the State alleged, *inter alia*, that respondent was unfit because she had "failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from [her] and/or ha[d] failed to make reasonable progress toward the return of the child to [her] within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, *** and/or within any 9 month period after said finding," in violation of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2012)) and section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29 (West 2012)). The petition also alleged that respondent was unfit under section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2012)) because she was unable to discharge parental responsibilities due to mental illness. Additionally, the petition alleged that it would be in N.T.'s best interest to appoint a guardian with the right to consent to her adoption because she had resided with her foster parent since January 2011, the foster parent wished to adopt N.T., and adoption by the foster parent would be in N.T.'s best interest.

¶ 12     At a status hearing on February 11, 2014, respondent continually interrupted the proceedings and the court ordered respondent removed from the courtroom.

¶ 13     On March 13, 2014, the juvenile court entered a permanency order, again setting the permanency goal as substitute care pending court determination on termination of parental rights. The reasons for selecting the goal were listed as: "[N.T.] is 3 years old and is placed in a relative foster home. She is developmentally on target and not in need of services. Mother has a mental health diagnosis and she has been psychiatrically hospitalized 5 times within the last reporting period. She is currently psychiatrically hospitalized. She is not engaged in any services. The father is unknown."

¶ 14     The parties came before the court on May 21, 2014, for a hearing on the State's termination petition. The State withdrew its allegations as to section 1(D)(p), leaving the allegations concerning "reasonable efforts" under section 1(D)(m) as the sole basis for its termination petition as to respondent.

¶ 15     The only witness who testified during the unfitness portion of the proceedings was Angela Shumate, who testified on behalf of the State that she was a case manager at Unity Parenting and Counseling Center and was assigned to N.T.'s case. Shumate was the only case manager assigned to N.T.'s case, as she was assigned in December 2010.

¶ 16     Shumate testified that in January 2011, respondent was assessed for services and was determined to be in need of medication monitoring, individual therapy, family classes, and

visitation. Later, in March 2011, respondent tested positive for marijuana use, so she was also determined to be in need of substance-abuse treatment. Respondent completed a parenting class but did not complete individual therapy. Initially, therapy services were provided through Unity, but they were transferred to Metropolitan Family Services to avoid duplication in services, since Metropolitan was providing respondent's medication monitoring. Shumate testified that when services were transferred to Metropolitan, respondent did not complete the services. Shumate testified that Metropolitan had difficulty reaching respondent to make appointments with a therapist and a psychiatrist and respondent "wasn't disclosing a lot of information."

¶ 17      Shumate testified that respondent was compliant with her medication as of the March 2011 adjudication. Initially, respondent was receiving her medication through injections, but the medication caused weight gain and diabetes, so in June 2012, respondent was taken off the injections and was instructed to take her medicine orally. Shumate believed that respondent stopped compliance with her medication in approximately October 2012, based on the "incoherent or rambling conversations" respondent had with Shumate.

¶ 18      Shumate testified that due to respondent's conversations and behavior, N.T. would have been at risk in respondent's care. As an example of respondent's inappropriate behavior, Shumate testified that at one point, respondent walked down the street while undressed from the waist down; Chicago police discovered respondent and hospitalized her. More recently, on April 7, 2014, respondent came to Deirdra's home and claimed that she needed to use the bathroom. Deirdra's paramour allowed her into the home, where respondent observed N.T. Respondent then became engaged in a physical altercation with the paramour, resulting in respondent breaking all of the windows of the paramour's vehicle. Respondent was psychiatrically hospitalized due to the incident, and "[N.T.] witnessed that whole thing and she will not stop talking about it to this day."

¶ 19      Shumate testified that respondent's last scheduled visit with N.T. was during Thanksgiving in 2013. Given respondent's medication noncompliance, the agency suspended visits at that point. Shumate testified that after the permanency goal was changed to termination of parental rights, the agency was no longer required to provide services to respondent, but she encouraged respondent to continue attending therapy with Metropolitan because that would be paid through respondent's medical card. Respondent did for a time, but then stopped; Shumate made this assumption because respondent revoked the consent for Metropolitan to release information to Shumate in September or October 2013.

¶ 20      On July 30, 2014, the juvenile court entered an order finding by clear and convincing evidence that respondent was unfit due to failure to make reasonable efforts to correct the conditions that were the basis of the removal during five nine-month periods: March 25, 2011, to December 25, 2011; December 25, 2011, to September 25, 2012; September 25, 2012, to June 25, 2013; June 25, 2013, to March 25, 2014; and August 21, 2013, to May 21, 2014.

¶ 21      The parties then proceeded to the best interest hearing, at which Shumate was again called to testify on behalf of the State. Shumate testified that N.T. was currently placed in the home of Deirdra T., her maternal grandmother, who lived with her paramour, Raynard M. Shumate last visited the home on July 7, 2014, and found the placement to be safe and appropriate, with no signs of abuse or neglect. Shumate testified that N.T. was "very close" to her older sister, who did not live in Deirdra's home but visited five to six times a month. Shumate testified that N.T. knew who her mother was, recognized respondent as her mother, and had a bond with her.

Deirdra had informed Shumate that "if the adoption does take place, if she sees that mom is on her medication and not being defensive or aggressive, she is open to supervising a visit if necessary."

¶ 22 Deirdra testified that she was N.T.'s maternal grandmother and had been her foster mother for N.T.'s entire life. She testified that she wanted to adopt N.T. "[s]o that she knows that nanny's not going anywhere." After cross-examination by respondent's counsel, the juvenile court asked Deirdra several questions:

> "Q. Ms. [T.], you indicated that [N.T.] knows who her mother is; is that correct?
>
> A. That is correct.
>
> Q. And she loves her mother; is that correct?
>
> A. She does.
>
> Q. In your opinion, who does [N.T.] look to for support and comfort?
>
> A. She comes to me.
>
> Q. Okay. And you have already indicated that–she has indicated that she doesn't want you to go away. Do you believe that, again in your opinion based on your interaction with [N.T.], that she sees you as her de facto parent and care provider and protector?
>
> A. Yes."

¶ 23 The court found that it was in N.T.'s best interest to terminate respondent's parental rights, noting that "[w]hile clearly the mother has been in the child's life, it would appear to be more as a sibling than a–an older sibling than a parent. More as a peer than someone that a child has a right to look to for support, care, comfort, sense of being, and knowing that that individual will be there for them." The court further noted that "clearly Ms. Deirdra [T.] offers that and has been that and as she said [N.T.] has been with her all of her life. [N.T.] was born on December 24th, of 2010 and [N.T.] was placed with [Deirdra] on January of 2011 so that essentially is the only home that she has known." Accordingly, the court ordered the parental right of respondent terminated. This appeal follows.

¶ 24 ANALYSIS

¶ 25 On appeal, respondent raises a number of issues. First, she argues that the juvenile court's finding that it was in N.T.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. Additionally, she argues that she was deprived of due process during the termination proceedings when (1) the juvenile court admonished Deirdra that it would consider adoption and not guardianship in any termination proceedings, (2) the juvenile court assumed the role of an advocate in questioning Deirdra during the best interest hearing, and (3) the juvenile court did not order an evaluation or hearing as to respondent's fitness to stand trial. We consider each argument in turn.

¶ 26 I. Best Interest Determination

¶ 27 We first consider whether the juvenile court's finding that it was in N.T.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. Under the Juvenile Court Act, termination of parental rights requires a two step process. First, there must be a showing, by clear and convincing evidence, that the parent is unfit, as defined in section 1 of the Adoption Act. *In re C.W.*, 199 Ill. 2d 198, 210 (2002); *In re Brown*, 86 Ill. 2d

147, 152 (1981). Since the juvenile court was in the best position to view and evaluate the parties, its decision is entitled to great deference, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Brown*, 86 Ill. 2d at 152. A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Additionally, due to the "delicacy and difficulty of child custody cases *** wide discretion is vested in the [juvenile court] to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." (Internal quotation marks omitted.) *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). If the court makes a finding of unfitness, it then must decide whether it is in the best interest of the child to terminate parental rights. See 705 ILCS 405/2-29(2) (West 2012); *In re C.W.*, 199 Ill. 2d at 210. However, the best interests of the child cannot be considered when the court is determining fitness. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990).

¶ 28    In the case at bar, respondent does not challenge the juvenile court's finding that she was unfit under section 1(D)(m) of the Adoption Act. Accordingly, we proceed to the second step of the analysis, the best interest determination. Once a parent has been found unfit, "the parent's rights must yield to the best interests of the child." *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002). The State has the burden of proving that it is in the child's best interest to terminate parental rights by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Section 1-3 of the Juvenile Court Act enumerates a number of factors that must be considered when determining whether termination of parental rights is in the minor's best interest, including (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2012). "Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. "The [juvenile] court's best interest determination need not contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the [juvenile] court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Upon review, a lower court's determination that the State has met its burden will not be reversed unless it was against the manifest weight of the evidence. *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005). As noted, a finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re Gwynne P.*, 215 Ill. 2d at 354.

¶ 29    In the case at bar, the juvenile court determined that the State demonstrated that it would be in N.T.'s best interest to terminate respondent's parental rights by a preponderance of the evidence. We cannot find that this finding was against the manifest weight of the evidence. The evidence before the juvenile court established that respondent and N.T. shared a bond, that N.T. knew respondent as her mother, and that visits between them were generally appropriate. However, the evidence also established that respondent's medication noncompliance resulted in behavior that placed N.T. at risk, including a physical altercation between respondent and Deirdra's paramour that N.T. witnessed only a few months before the termination trial. Additionally, N.T. had been living with Deirdra for her entire life and was bonded with Deirdra, referring to her as "nanny" and turning to her for support and comfort. Deirdra also

wished to adopt N.T. "[s]o that she knows that nanny's not going anywhere," thereby providing a source of stability to N.T. Deirdra's home also allowed N.T. to maintain a relationship with her older sister, who visited five to six times a month, as well as with respondent. Shumate testified that Deirdra informed her that she was open to supervising visits between respondent and N.T. as long as respondent was medication compliant and "not being defensive or aggressive." Based on the record before us, we cannot find that the juvenile court's finding that it was in N.T.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 30        Respondent argues that the juvenile court did not perform "nuanced balancing" of the statutory factors, leaving the majority of the statutory factors unaddressed. However, as noted, the juvenile court is not required to explicitly refer to each statutory factor in its best interest determination. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Indeed, "the [juvenile] court need not articulate any specific rationale for its decision, and a reviewing court need not rely on any basis used by a trial court below in affirming its decision." *In re Deandre D.*, 405 Ill. App. 3d 945, 954-55 (2010) (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 262-63 (2004)). Here, we do not agree with respondent's contention that the juvenile court failed to give adequate consideration to the statutory best interest factors. The evidence before the juvenile court established that N.T.'s physical and emotional welfare were best served by permitting Deirdra to adopt her and that adoption by Deirdra would provide N.T. with a safe, stable environment in which she could continue to thrive.

¶ 31        We also find unpersuasive respondent's attempt to liken her situation to that present in *In re M.F.*, 326 Ill. App. 3d 1110 (2002). In that case, the appellate court affirmed the termination of the mother's parental rights as to her younger child, but reversed the termination of her parental rights as to her older child, T.R., because the appellate court concluded it was not in T.R.'s best interest to terminate the mother's parental rights. *In re M.F.*, 326 Ill. App. 3d at 1120. T.R.'s father had custody of T.R. after the mother and the father divorced, so the mother was limited to visitation under the judgment for dissolution of marriage. *In re M.F.*, 326 Ill. App. 3d at 1117. Thus, the appellate court noted that "[t]here was no showing of a benefit to T.R. by the termination of [the mother's] parental rights. T.R. would not gain any more stability in her life because there was no prospect of adoption and she already lived with [her father], who had full custody and guardianship." *In re M.F.*, 326 Ill. App. 3d at 1118.

¶ 32        First, we note that "every wardship case [is] *sui generis*, and it must be decided solely on its own particular facts." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 31. Additionally, in the case at bar, there would be a benefit by the termination of respondent's parental rights, in that it would permit Deirdra to adopt N.T. Unlike the situation in *In re M.F.*, here, N.T. would gain stability by being adopted by Deirdra and knowing "that nanny's not going anywhere." Thus, we cannot find the present situation to be similar to that in *In re M.F.* and affirm the juvenile court's finding that it was in N.T.'s best interests to terminate respondent's parental rights.

¶ 33                                                    II. Due Process

¶ 34        Respondent also claims that she was deprived of due process during the termination proceedings when (1) the juvenile court admonished Deirdra that it would consider adoption and not guardianship in any termination proceedings, (2) the juvenile court assumed the role of an advocate in questioning Deirdra during the best interest hearing, and (3) the juvenile court did not order an evaluation or hearing as to respondent's fitness to stand trial.

¶ 35                                A. Admonishment to Deirdra

¶ 36       First, respondent takes issue with the juvenile court's comments to Deirdra during the temporary custody hearing in December 2010. During the hearing, the court addressed Deirdra:

> "THE COURT: When we place children, one of the things we try to find is a relative placement. But we need that relative to understand that while we hope to be able, once we bring a child into the system if we can't avoid that, we hope to be able to return the child to the natural parent.
>
> But should return home fail for any reason, we ask foster parents, whether they be relatives or not, to do a very difficult thing: One, they should be supportive of the return home goal. Two, should return home fail for any reason, they should be prepared to provide permanency and stability for the child.
>
> On a child this young, the first thing the Court's going to look at is adoption, okay? So you need to be aware of that. And when we look at this, we look at it in the best interest of the child. We don't simply say well, I don't want to change the family dynamic is not something that will necessarily keep the Court from terminating parental rights and making the child available for adoption, because the priority is to put the child in a stable and permanent home, to give him or her that security.
>
> And what we've found is with private guardianship, a private guardian at any time for any reason can come back to the Court, and they do, and say I don't want to be the guardian anymore, and then the child is back in flux.
>
> So I have to have a reason to rule out adoption, and a relative simply not wanting to take that step is not a good reason.
>
> So I'm not suggesting at this point I'm making any judgment as to how this is going to go. Hopefully your daughter will make progress with services, remain medication compliant, if that's what she needs to do, and can be a parent for this child.
>
> But if she can't, I'm going to be looking to, you know, put the child in a permanent situation. Now even terminating your daughter's parental rights and having you adopt the child, in essence, it will probably–it will legally change the child's status, but in reality, you're always going to be the mother's mother, and you're always going to want that child to know that.
>
> And that's the reality that I deal with when I make these decisions. But I want you to be aware of that from the very beginning, because oftentimes in the effort to look for relatives that will take the child, these things aren't discussed with them all the time, and they're under the misconception that they have the option to just say well, okay, I'll do private guardianship, and that's not necessarily the case. Okay?
>
> DEIRDRA: Yes."

Respondent claims that "[b]y foreclosing the option of guardianship at the very beginning of the case," the juvenile court acted "as a partisan and not as a neutral arbitrator," misapplied the law, and shifted the burden of proof to respondent by imposing a rebuttable presumption of adoption. We do not find this argument persuasive.

¶ 37       Respondent fails to recognize that, rather than imposing a rebuttable presumption of adoption, the juvenile court was making an accurate statement of the law when it stated that adoption must first be ruled out before guardianship would be considered. Under section

2-28(2) of the Juvenile Court Act, at each permanency hearing, the juvenile court must set a permanency goal, choosing from a list of possible goals. 705 ILCS 405/2-28(2) (West 2012). The fifth possible goal, listed as paragraph (D) of section 2-28(2), is "Adoption, provided that parental rights have been terminated or relinquished." 705 ILCS 405/2-28(2)(D) (West 2012). The sixth goal, listed as paragraph (E), is "The guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out." 705 ILCS 405/2-28(2)(E) (West 2012). Thus, by the express language of the Juvenile Court Act, guardianship cannot be considered as a permanency goal unless adoption has been ruled out as an option. See also *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 33 ("the permanency goals of return home and adoption are 'statutorily preferred' over private guardianship"); *In re Jeffrey S.*, 329 Ill. App. 3d 1096, 1103 (2002) ("The trial court can order a subsidized guardianship only when the options of return home and adoption have been ruled out."). The juvenile court's informing Deirdra of this fact is not error.

¶ 38    Furthermore, informing Deirdra of the law was not the juvenile court acting as a partisan. The court was simply trying to ensure that Deirdra was aware of the potential consequences of her agreeing to serve as a foster parent to N.T. The court indicated that it "want[ed] [Deirdra] to be aware of that from the very beginning, because oftentimes in the effort to look for relatives that will take the child, these things aren't discussed with them all the time, and they're under the misconception that they have the option to just say well, okay, I'll do private guardianship, and that's not necessarily the case." We cannot find that this in any way constituted acting in a partisan manner. Accordingly, we cannot find that respondent was denied due process by the court's comments.

¶ 39                                    B. Questioning of Deirdra

¶ 40    Next, respondent claims that the juvenile court denied her due process by assuming the role of an advocate during the best interest hearing in questioning Deirdra. During the best interest hearing, Deirdra testified on behalf of the State. After cross-examination by respondent's counsel, the juvenile court asked Deirdra several questions:

"Q. Ms. [T.], you indicated that [N.T.] knows who her mother is; is that correct?

A. That is correct.

Q. And she loves her mother; is that correct?

A. She does.

Q. In your opinion, who does [N.T.] look to for support and comfort?

A. She comes to me.

Q. Okay. And you have already indicated that–she has indicated that she doesn't want you to go away. Do you believe that, again in your opinion based on your interaction with [N.T.], that she sees you as her de facto parent and care provider and protector?

A. Yes."

Respondent claims that that the juvenile court "overstepped its bounds as a neutral factfinder" by eliciting the "damaging" testimony that, in Deirdra's opinion, she was N.T.'s *de facto* parent. We do not find this argument persuasive.

¶ 41    As an initial matter, both the State and the public guardian claim that respondent has forfeited this issue by failing to object during the termination trial. Generally, an issue that was

not objected to during trial and raised in a posttrial motion is forfeited on appeal. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25. However, application of the forfeiture rule is less rigid when the basis of the objection is the trial court's conduct. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25. "Specifically, where the trial court departs from its role and becomes an advocate for the State's position, no objection by opposing counsel is necessary to preserve the issue for review." *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000). We choose to find no forfeiture in this case and review the issue on its merits. We review the propriety of the juvenile court's questioning of Deirdra under an abuse of discretion standard. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 21. "Under the abuse of discretion standard, the reviewing court must determine whether the circuit court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (Internal quotation marks omitted.) *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002).

¶ 42    Generally, "[a] trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *Obernauf v. Haberstich*, 145 Ill. App. 3d 768, 771 (1986), and Ill. R. Evid. 614(b) (eff. Jan. 1, 2011)). Additionally, the Juvenile Court Act provides that "[i]n all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 ILCS 405/1-2(2) (West 2012). Thus, under the Juvenile Court Act, "unlike its customary role in civil or criminal proceedings, the court cannot sit passively and await the parties' presentation of evidence. Instead, the Act requires that it must act affirmatively, and perhaps at times aggressively, to ferret out information before it can decide that a child's interest is better served by removal from the family." *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991).

¶ 43    "The trial judge is given wider latitude in examining witnesses in [a] bench trial, where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *Obernauf*, 145 Ill. App. 3d at 771). However, "the trial court must not depart from its function as a judge and may not assume the role as an advocate for either party." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *People v. Faria*, 402 Ill. App. 3d 475, 479 (2010)). "The propriety of an examination of a witness by the trial court must be determined by the circumstances of each case and rests within the discretion of the trial court." *In re Maher*, 314 Ill. App. 3d at 1097 (citing *People v. Gallo*, 260 Ill. App. 3d 1032, 1039 (1994)).

¶ 44    In the case at bar, we cannot find that the juvenile court abused its discretion in questioning Deirdra. The record shows that the court asked Deirdra a total of four questions that elicited the truth, clarified her testimony and shed light on material issues regarding N.T. Specifically, the court clarified that, in Deirdra's opinion, N.T. knew who her mother was and loved respondent. The court further asked Deirdra who N.T. looked to for comfort and support and asked her opinion as to whether N.T. considered Deirdra as her *de facto* parent, both questions that elicited the truth and shed light on material issues in the case. As in *In re Tamesha T.*, the juvenile court's questions "were designed to elicit further information that was essential to the adjudication of the issues before the court, and the questions could just as easily have elicited responses from the witness[ ] that were favorable to" respondent. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 27. Indeed, the record indicates that Deirdra's responses to two of the

court's four questions were favorable to respondent–she reaffirmed that N.T. loved respondent and recognized respondent as her mother. Accordingly, we do not find that the juvenile court was acting as an advocate for the State in asking its questions, and therefore do not find that it abused its discretion in its questioning.

¶ 45                                    C. Respondent's Fitness

¶ 46    Finally, respondent claims that she was denied due process where the juvenile court did not order an evaluation or hearing about her fitness to stand trial even though the record contained "ample doubt" about respondent's ability to understand the proceedings, testify on her own behalf, and cooperate with her counsel. The question of whether termination of respondent's parental rights without a hearing to determine her fitness to stand trial violated respondent's due process rights is reviewed *de novo*. *In re Bernice B.*, 352 Ill. App. 3d 167, 174 (2004). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 47    " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). It " 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Mathews*, 424 U.S. at 334 (quoting *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)). In order to determine whether procedures are constitutionally sufficient, courts balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335; see also *In re Bernice B.*, 352 Ill. App. 3d 167, 176 (2004) (applying *Mathews* factors in the context of termination proceedings); *In re M.R.*, 316 Ill. App. 3d 399, 402 (2000) (same).

¶ 48    This court has twice considered the issue of whether termination of parental rights without a fitness hearing violates a parent's due process rights, applying the *Mathews* factors each time, and has concluded that the parent's due process rights were not violated by the lack of a fitness hearing.[1]  First, in *In re Bernice B.*, we considered the narrow question of "whether due process requires fitness to stand trial hearings for parents in termination trials who fail to cooperate with the fitness evaluation process." *In re Bernice B.*, 352 Ill. App. 3d at 168. In considering the first *Mathews* factor–the private interest that will be affected–we noted that there were two separate, competing private interests at stake. "First, the parent has an interest in the custody, care, and control of his child and in maintaining a parental relationship with her." *In re Bernice B.*, 352 Ill. App. 3d at 176 (citing *In re D.T.*, 338 Ill. App. 3d 133, 152 (2003)). " '[T]his interest is fundamental and will not be terminated lightly.' " *In re Bernice B.*, 352 Ill. App. 3d at 176 (quoting *In re M.H.*, 196 Ill. 2d 356, 365 (2001)). "Second, 'the child has an important interest in a loving, stable and safe home environment, which may not involve any relationship with her natural parent.' " *In re Bernice B.*, 352 Ill. App. 3d at 176 (quoting

_____

[1]We considered the same issue in a third case, *In re Sharon Lynn T.*, 2013 IL App (2d) 121103-U, and reached the same result. However, as that case is an unpublished order, it is not precedential and we do not discuss it in our analysis of the issue.

- 13 -

*In re D.T.*, 338 Ill. App. 3d at 152). " 'While she has a stake in preserving some kind of relationship with her natural parent, she may also have an interest in maintaining a relationship with her foster parents.' " *In re Bernice B.*, 352 Ill. App. 3d at 176 (quoting *In re D.T.*, 338 Ill. App. 3d at 152). We found that the child in that case had a significant interest in maintaining the relationship with her foster mother, with whom she had lived for five years and on whom she depended for her special needs. *In re Bernice B.*, 352 Ill. App. 3d at 176. We further noted that a child had an interest in terminating state custody, since a state ward was limited in traveling, receiving health care, or engaging in religious instruction by the requirement of written consent from the child's parent, guardian, or other legal custodian. *In re Bernice B.*, 352 Ill. App. 3d at 176.

¶ 49 With respect to the second *Mathews* factor–the risk of erroneous deprivation and the value of additional safeguards–we noted that the father in that case "identifie[d] no evidence and present[ed] no argument indicating that the outcome of the termination proceedings would have been any different had the court waited to commence those proceedings until he was 'restored to fitness.' " *In re Bernice B.*, 352 Ill. App. 3d at 177. Thus, "[t]he procedures used by the trial court properly safeguarded respondent's rights." *In re Bernice B.*, 352 Ill. App. 3d at 177. We further found that "[t]he risk of error to respondent was minimal because he was effectively represented by counsel, he testified on his own behalf, and he provided exhibits which were admitted into evidence and considered by the trial court." *In re Bernice B.*, 352 Ill. App. 3d at 177. Accordingly, we found the absence of a fitness hearing offered little or no risk that the father's rights were erroneously terminated. *In re Bernice B.*, 352 Ill. App. 3d at 177.

¶ 50 In fact, we noted that under the facts of the case, "the fitness hearing requested by respondent could potentially have served to provide additional evidence weighing in favor of termination of his right to parent Bernice," since a finding that the father was not mentally fit could constitute evidence related to the best interest factors and weigh in favor of termination. *In re Bernice B.*, 352 Ill. App. 3d at 177. We also noted that the father had failed to avail himself of mental health services that were available when he did not attend a psychiatric evaluation for purposes of assessing whether psychotropic medication would help restore mental fitness. *In re Bernice B.*, 352 Ill. App. 3d at 177.

¶ 51 Finally, with respect to the third *Mathews* factor–the governmental interests at issue–we found that the State had a *parens patriae* interest in preserving and promoting the welfare of the child. *In re Bernice B.*, 352 Ill. App. 3d at 177 (citing *In re D.T.*, 338 Ill. App. 3d at 153). We noted that "[n]either the postponement of termination proceedings until a fitness to stand trial hearing could be conducted nor the indefinite postponement of the termination proceedings until respondent could be restored to fitness would further the State's interest in preserving and promoting Bernice's welfare." *In re Bernice B.*, 352 Ill. App. 3d at 177-78. Instead, "such postponements would further delay Bernice's interest in finding a permanent home." *In re Bernice B.*, 352 Ill. App. 3d at 178.

¶ 52 Additionally, we found that "precluding termination of parental rights until the parent in question has been determined mentally fit would impose increased fiscal costs and administrative burdens on the State," with the State required to expend legal resources to establish fitness and to pay for the treatment to restore the parent to fitness. *In re Bernice B.*, 352 Ill. App. 3d at 178. "In order to establish such fitness, the State could be required indefinitely to pay psychiatrists or other mental health professionals to examine, treat and report on the subject parent. The process could take months or years, or go on indefinitely,

- 14 -

adding to the fiscal costs and administrative burdens." *In re Bernice B.*, 352 Ill. App. 3d at 178. We also noted that examination, evaluation, and assessment could go on indefinitely, especially if the parent refused to cooperate. *In re Bernice B.*, 352 Ill. App. 3d at 178. "Such delay would defeat the child's fundamental right to a stable, nurturing home." *In re Bernice B.*, 352 Ill. App. 3d at 178. The child would also stay in the preadoptive home, but would not gain "the benefits of permanency provided by adoption," and the State would be required to pay for foster care during the indefinite period of delay. *In re Bernice B.*, 352 Ill. App. 3d at 178. Balancing the three *Mathews* factors, we determined that the absence of a fitness hearing did not violate the father's right to due process. *In re Bernice B.*, 352 Ill. App. 3d at 178.

¶ 53 Two years after *In re Bernice B.*, we considered whether the denial of a parent's motion for a fitness to stand trial hearing violated the parent's due process rights. In *In re Charles A.*, 367 Ill. App. 3d 800, 801 (2006), the mother's attorney filed a motion asking the court to hold a fitness to stand trial hearing and the juvenile court denied the motion. On appeal, we again applied the three *Mathews* factors to determine whether this denial violated the mother's due process rights. With regard to the first factor, we noted, as we did in *In re Bernice B.*, that there were two competing private interests–the parent's and the child's. *In re Charles A.*, 367 Ill. App. 3d at 803. We also noted that in terms of the governmental interests at issue, the State had a *parens patriae* interest in the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. *In re Charles A.*, 367 Ill. App. 3d at 803. We noted that "[b]ecause a delay in the adjudication of a termination proceeding can cause grave harm to a child and the family [citation], parental termination cases must be resolved expeditiously." *In re Charles A.*, 367 Ill. App. 3d at 803. The indefinite postponement of termination proceedings would further delay a child's interest in finding a permanent home and, accordingly, "would frustrate the State's *parens patriae* interest in promoting the welfare of the child." *In re Charles A.*, 367 Ill. App. 3d at 804. The State would also bear the increased fiscal cost and administrative burden of expending legal resources to establish the respondent's competency, paying for the treatment to restore the respondent to fitness, and paying for the continuance of the child's foster care during the delay. *In re Charles A.*, 367 Ill. App. 3d at 804.

¶ 54 Finally, with respect to the risk of erroneous deprivation and value of additional safeguards, we noted that the mother had failed to explain how she could have better assisted her counsel, what additional evidence would have been introduced, or any argument explaining how the outcome of the termination hearing would have been different. *In re Charles A.*, 367 Ill. App. 3d at 804. We also pointed out that a finding that the mother was not mentally fit could have provided additional evidence weighing in favor of termination. *In re Charles A.*, 367 Ill. App. 3d at 804. We concluded that "[t]he current procedures provided for under the Act properly safeguard a parent's rights. Parents have the right to be present, to be heard, to present evidence, to cross-examine witnesses, to examine court files and records, and to be represented by counsel. [Citation.] In this case, the respondent was represented by counsel, who cross-examined witnesses and argued her case. Based upon the record before us, we conclude that the absence of a fitness hearing offered little or no risk that the respondent's parental rights were erroneously terminated." *In re Charles A.*, 367 Ill. App. 3d at 804-05. After considering the three *Mathews* factors, we determined that the mother was not denied due process by the juvenile court's failure to hold a fitness hearing. *In re Charles A.*, 367 Ill. App. 3d at 805.

¶ 55     In the case at bar, we reach the same conclusions as we did in *In re Bernice B.* and *In re Charles A.*, namely, that respondent was not denied due process by the juvenile court's failure to *sua sponte* order a fitness evaluation or hearing. With respect to the first factor, while respondent had an interest in raising N.T., N.T. also had an interest in a safe and stable environment. The evidence at the hearing established that N.T. had such an environment in the care of Deirdra, with whom she had lived for her entire life, and that terminating respondent's parental rights would permit Deirdra to offer N.T. additional stability in the knowledge that Deirdra would never leave.

¶ 56     With respect to the second factor, we cannot agree with respondent's contention that the absence of a fitness to stand trial hearing increased the risk that respondent's rights were erroneously terminated. Respondent claims that her case is different than *In re Charles A.*, because the State withdrew its allegation that respondent was unfit due to mental illness, so a fitness evaluation and hearing would not have exposed her to any greater risk of an adverse finding. Respondent's argument overlooks the fact that the State withdrew the allegation at the beginning of the termination trial. If, as respondent argues, she should have been evaluated prior to the termination proceedings, then the evaluation and hearing would have occurred prior to the withdrawal of the allegation. Consequently, the results of that evaluation certainly could have impacted the State's decision to withdraw the allegation of unfitness on that basis. Furthermore, respondent's only other argument on this issue is that she could have testified at the best interest hearing about her relationship with N.T. and "disputed the trial court's conclusion that she was no more than a big sister." We cannot find that the absence of this testimony increased the risk that respondent's rights were erroneously terminated.

¶ 57     Finally, with respect to the third factor, as in *In re Bernice B.* and *In re Charles A.*, the State has a *parens patriae* interest in preserving and promoting N.T.'s welfare. Prolonging the termination proceedings would leave N.T. unable to take advantage of the stability offered by Deirdra's adoption of her. Additionally, the State would bear increased fiscal and administrative costs, as explained in *In re Bernice B.* and *In re Charles A.* Respondent argues that "[g]iven [her] history of compliance with court-ordered evaluations, there is no basis in this record to suggest that resolution of the question of her fitness to stand trial would be protracted." However, as the public guardian notes, respondent was ordered to participate in a second CCJCC evaluation but refused, indicating that her "history of compliance" is not particularly helpful to her case. Additionally, respondent's argument that cooperation equates to a quick resolution does not necessarily follow. Respondent's entire argument is based on her contention that she was not fit to stand trial. Accordingly, if that was true, then the "resolution of the question of her fitness to stand trial" would be the conclusion that she was not fit. Rather than being the end of the road, the termination proceedings would then be halted while efforts were made to restore respondent to fitness. This would certainly delay the proceedings to some extent.

¶ 58     Considering the three *Mathews* factors, we come to the same conclusion as we did in both *In re Bernice B.* and *In re Charles A.* Respondent's lack of a fitness to stand trial evaluation or hearing did not deprive her of due process.

¶ 59     As a final matter, respondent argues that she was deprived of effective assistance of counsel because her counsel did not request an evaluation and hearing on whether she was fit to stand trial. A respondent in a proceeding under the Juvenile Court Act has the right to the effective assistance of counsel. *In re K.O.*, 336 Ill. App. 3d 98, 111 (2002); *In re R.G.*, 165 Ill.

App. 3d 112, 127 (1988). The Illinois Supreme Court has held that, to determine whether a defendant was denied his right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 60  Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

¶ 61  To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 62  In the case at bar, we cannot find that respondent's counsel was ineffective for failing to request a hearing on respondent's fitness to stand trial. As we explained above, respondent had no due process right to a fitness hearing, so counsel's failure to request one would not constitute ineffective assistance. Additionally, we note that unlike a criminal case, failure to request a fitness hearing here could have been trial strategy. The State initially alleged that respondent was an unfit parent on two grounds, including an allegation that respondent was unfit under section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2012)) because she was unable to discharge parental responsibilities due to mental illness. This ground, as noted, was not withdrawn until the beginning of the termination trial. Thus, as explained in our consideration of the *Mathews* factors, a fitness to stand trial evaluation could have provided additional evidence against respondent on the ground (p) allegation. In that case, trial counsel could reasonably have determined that it was better to proceed without a fitness evaluation. Accordingly, we cannot find that respondent's counsel was ineffective.

¶ 63                                                    CONCLUSION

¶ 64  For the reasons set forth above, the juvenile court's termination of respondent's parental rights is affirmed. First, the court's finding that it was in N.T.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. Additionally, respondent was not denied a fair hearing because (1) the juvenile court properly informed Deirdra as to the law when cautioning her that adoption was favored over guardianship; (2) the

juvenile court was not acting as an advocate by asking Deirdra four questions during the best interest hearing; and (3) respondent was not entitled to a hearing on her fitness to stand trial prior to the termination proceedings.

¶ 65        Affirmed.