2025 IL App (1st) 242008
No. 1-24-2008

FIRST DIVISION
August 25, 2025

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* W.N.K., | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois, |
| Minor-Appellee | ) | Child Protection Division |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 20JA 00414 |
| | ) | |
| v. | ) | |
| | ) | |
| E.S., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | Jennifer Payne, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1 Respondent-appellant E.S. (respondent) appeals from the circuit court's order that terminated her parental rights with respect to her son, minor-appellee, W.N.K. (the minor). For the following reasons, we affirm the circuit court.

¶ 2 BACKGROUND

¶ 3 The minor was born on May 26, 2022. Respondent is the minor's biological mother. The minor's biological father, N.K. (the father), is not a party to this appeal. The record reflects that

respondent and the father are also the parents of two older minors, who were the subject of separate proceedings in prior cases under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)). In addition, respondent has an adult son, who was born in 2000.

¶ 4 Shortly after the minor's birth, on June 3, 2022, the State filed a petition for adjudication of wardship. The petition alleged that respondent and the father had a history of domestic violence and that they had two other minor children who "were previously in DCFS custody with findings having been entered and their cases closed in April of 2022 to subsidized guardianship." The State alleged that the minor was neglected within the meaning of the Juvenile Court Act due to an injurious environment (*id.* § 2-3(1)(b)) and abused due to a substantial risk of injury (*id.* § 2-3(2)(ii)).

¶ 5 On June 6, 2022, the court granted temporary custody to the Department of Children and Family Services (DCFS) guardianship administrator with the right to place the minor. On the same date, the Cook County Public Guardian was appointed as the minor's guardian *ad litem*.

¶ 6 Following an adjudication hearing, on November 3, 2022, the court entered an adjudication order finding that the minor was neglected due to an injurious environment. In that order, the court found that respondent, "despite engaging in services and making efforts, has remained in a domestic violence relationship with father, the very relationship which led to the removal of minor's two siblings several years ago, and mother [respondent] has made no meaningful progress despite engagement in services."

¶ 7 On December 1, 2022, the court entered a disposition order in which it found that (1) respondent was unable to care for, protect, train, or discipline the minor and (2) the father was both unable and unwilling to care for, protect, train, or discipline the minor. The court placed the minor in the custody of the DCFS guardianship administrator with the right to place the minor.

¶ 8      On the same date, the court entered a permanency order setting the permanency goal of "return home within 12 months." That order reflected that the minor was six months old and in a foster home, respondent was "engaging in services and visiting, [but] father is not engaging in services and not visiting."

¶ 9      On May 25, 2023, the court entered another permanency order specifying a goal of return home within 12 months. In that order, the court noted that the minor was almost one year old and was receiving services to address developmental delays. It found that although respondent was "engaged in services and weekly visits, there continues to be ongoing concerns regarding progress in those services, including domestic violence." The order noted that the father was not involved in services or visiting the minor.

¶ 10     On December 7, 2023, the court ordered Metropolitan Family Services to disclose respondent's medical records, including domestic violence counseling records, to the parties pursuant to the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2022)).

¶ 11     On January 11, 2024, the court conducted a permanency hearing for the minor. During that hearing, respondent called her domestic violence counselor, Stacy Goodman, as a witness. When Goodman was asked about respondent's progress, Goodman declined to answer, citing the privilege under the Domestic Violence Act. 750 ILCS 60/227(b) (West 2024). The court indicated it did not need Goodman's testimony to set a permanency goal, but the issue of whether her testimony was privileged might become relevant if the State sought to terminate parental rights.

¶ 12     On February 1, 2024, the court entered a permanency order finding the appropriate goal was "substitute care pending court determination on termination of parental rights." It noted that respondent "has not made progress in addressing the domestic violence relationship with the

father," the natural father was not engaged in services, and the minor was "in a pre-adoptive placement where his needs are being met."

¶ 13    In April 2024, the State filed a petition seeking termination of respondent's and the father's parental rights and appointment of a guardian with the right to consent to adoption.

¶ 14    The State alleged that respondent and the father were unfit under section 1(D)(b) of the Adoption Act due to their failure to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare. 750 ILCS 50/1(D)(b) (West 2024). The State also alleged that both parents were unfit under subsection (m) of the same provision, based on their failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child or failure to make reasonable progress toward the return of the child within nine months after the adjudication of neglect or within a nine-month period after that finding. See *id.* § 1(D)(m). In a supplemental pleading, the State specified these nine-month periods were from November 3, 2022, through August 3, 2023, and from May 1, 2023, through February 1, 2024.

¶ 15    The State also alleged respondent was unable to parent the minor due to mental impairment or disability pursuant to subsection (p). See *id.* § 1(D)(p). As to the father only, the State alleged unfitness in that he had abandoned the minor, deserted the child for more than three months, and evidenced an intent to forgo parental rights. See *id.* § 1(D)(a), (c), (n).

¶ 16    The State's petition averred that the minor had resided in a foster home since June 7, 2022, the foster family desired to adopt him, and adoption was in the minor's best interest.

¶ 17    Motion *in Limine* Seeking Admission of Domestic Violence Counselor's Testimony

¶ 18    On April 4, 2024, the State filed a motion *in limine* seeking admission of testimony regarding respondent's progress in domestic violence services. The State noted that the court had expressed concern that disclosure of such information would violate section 227 of the Domestic

Violence Act. 750 ILCS 60/227(b) (West 2024) ("No domestic violence advocate or counselor shall disclose any confidential communication or be examined as a witness in any civil or criminal case *** without the written consent of the domestic violence victim except (1) in accordance with the provisions of the Abused and Neglected Child Reporting Act or (2) in cases where failure to disclose is likely to result in an imminent risk of serious bodily harm or death of the victim or another person."). The State argued that this privilege did *not* bar admission of the testimony in this case, because section 2-18 of the Juvenile Court Act provides: "The privileged character of communication between any professional person and patient or client, except privilege between attorney and client, shall not apply to proceedings subject to this Article." 705 ILCS 405/2-18(4)(e) (West 2024).

¶ 19    The State expressed that if it were unable to present evidence of respondent's failure to make progress in domestic violence services, it would "impermissibly compromise the People's ability" to prove its case.

¶ 20    The public guardian filed a brief in support of the State's motion. The public guardian agreed with the State that the privilege under the Domestic Violence Act was not applicable to proceedings under the Juvenile Court Act, in light of section 2-18 of the Juvenile Court Act. *Id.* In so doing, the public guardian argued that the legislature is presumed to be aware of preexisting law, and it pointed out that the Domestic Violence Act was already in effect when the legislature enacted section 2-18 of the Juvenile Court Act. The Public Guardian argued that the latter provision "created an exception" to the privilege in the Domestic Violence Act, such that respondent's domestic violence counselor could be compelled to testify.

¶ 21    Respondent filed an opposition to the State's motion in which she maintained that under the Domestic Violence Act, respondent's domestic violence counselor could not testify without respondent's consent.

¶ 22    On July 11, 2024, the court granted the State's motion *in limine* to permit the admission of Goodman's testimony. It remarked that it was "put in the position of finding that the two statutes are either directly at odds with each other which is not a result that is favored by courts, or I can find that the two statutes are not at odds with each other." The court reasoned that although the Domestic Violence Act creates a privilege between a domestic violence victim and counselor, section 2-18 of the Juvenile Court Act created an exception to that privilege. It explained that section 2-18 "is a blanket carve out for all professional privileges other than attorney/client for cases that are pending pursuant to article 2 of the Juvenile Court Act." The court found that this "carve out" to the privilege rendered Goodman's testimony admissible, since "this termination of parental rights case arises from an Article 2 case."

¶ 23                                  Termination Hearing

¶ 24    On July 18, 2024, the court conducted a termination hearing, which was attended by respondent but not by the father.

¶ 25    At the hearing, the court took judicial notice of the petition to terminate parental rights filed April 4, 2023, as well as the prior finding of neglect due to injurious environment.

¶ 26    The State called Dr. Sonali Kumari, a psychiatric attending physician at Cook County Health. Respondent had been Dr. Kumari's patient since January 2022. Respondent was diagnosed with major depressive disorder and was on an antidepressant medication. Dr. Kumari testified that she saw respondent on a regular basis, respondent attended all her appointments, and she was

compliant with her medication. Dr. Kumari testified that respondent was stable on her medication and that her depression symptoms were well-managed.

¶ 27    The State also called Dr. Luis E. Lopez, a psychologist and board president of Journey's Community Center, a mental health agency. Dr. Lopez testified that Saiyd Joyce, a licensed clinical social worker at the agency, interviewed respondent for a parenting capacity assessment in 2023. The assessment was requested by the Ada S. McKinley Community Services agency, which was working with DCFS. In March 2023, the parenting assessment was provided to Talon Phelps, the case manager for the minor's family.

¶ 28    During his testimony, Dr. Lopez referenced respondent's parenting assessment, which was admitted into evidence (People's exhibit No. 9) without objection. Respondent's parenting assessment reflected that "there were domestic violen[ce] incidents within the relationship dynamic" of this case. Thus, one of the recommendations was domestic violence education and therapy. Dr. Lopez testified that he and Joyce recommended that "domestic violence incidents should be looked at as a component of [respondent's] ability to parent a child or provide the safety for the child."

¶ 29    On cross-examination, Dr. Lopez acknowledged he had not personally met or interviewed respondent. He also agreed the parenting assessment reflected a "snapshot in time" and that he could not predict respondent's ability to parent in the future.

¶ 30    The State next called Dr. Martin Blackman, a licensed clinical psychologist. Dr. Blackman prepared a neuropsychological evaluation of respondent dated June 26, 2023. Without objection, Dr. Blackman's evaluation of respondent was admitted into evidence.

¶ 31    Dr. Blackman testified that he met with respondent for at least three hours and administered "a range of assessment measures" related to different areas of functioning. His report indicated

respondent had major depressive disorder, as well as learning disabilities for reading and written expression. Regarding symptoms of depression, Dr. Blackman indicated that respondent expressed "feelings of hopelessness, tearfulness, some difficulties with sleep, some challenges possibly with attention."

¶ 32    Asked about the impact of domestic violence on respondent's major depressive disorder, Dr. Blackman testified that domestic violence could negatively impact mood. Dr. Blackman also testified that respondent had some "difficulty in the IQ measure and working memory" as well as difficulty with "insight and judgment and problem solving."

¶ 33    Dr. Blackman recommended a number of interventions to help respondent parent the minor, including "therapy in terms of some of the issues relating to relationship and safety issues in terms of people that are involved in [her] life." He also recommended therapy to address depression and anxiety.

¶ 34    On examination by the public guardian, Dr. Blackman agreed his report indicated a risk factor for respondent was the ability to choose healthy relationships. He agreed that respondent is "able to articulate knowledge about" intimate partner violence, but she "doesn't put her knowledge into action." He agreed that she minimized the violence she experienced, such as by making statements like "everybody goes through things" when referring to intimate partner violence. Respondent spoke with a "level of detachment" when describing her experience. Dr. Blackman agreed that respondent knew there "may be issues with her relationship" with the minor's father, but she "exhibited limited insight" into how that impacted her safety and that of her children.

¶ 35    On cross-examination by respondent's counsel, Dr. Blackman acknowledged that he never spoke to respondent's therapist or domestic violence counselor. He did not know when the last incident of domestic violence occurred. He had never observed respondent interact with the minor.

¶ 36    Following Dr. Blackman, the State called Stacy Goodman, the clinical program supervisor for the domestic violence program at the Howard and Evanston Community Center. Respondent's counsel objected to Goodman's testimony, but the court reiterated its ruling that Goodman could testify based on the "carve-out in the Juvenile Court Act."

¶ 37    Before testifying about respondent, Goodman stated that she did not have a release from respondent and referred to the privilege under the Domestic Violence Act. However, the court told Goodman it had ruled that she was required to testify.

¶ 38    Goodman proceeded to testify that respondent had been her client since September 2022, pursuant to a DCFS service plan. Goodman's goal was to provide respondent emotional support and education related to domestic violence. She had weekly phone conversations with respondent that included domestic violence education, but they often talked about her visitation with her children as well as her medical issues.

¶ 39    Goodman referred to respondent as a survivor of domestic violence. Goodman was asked if respondent spoke to her about any contact with the minor's father. According to Goodman, respondent indicated that although the father's mail was delivered to respondent's apartment, this was the "majority of the contact" that she had with him.

¶ 40    Goodman testified that she discussed with respondent that "she did not have to be the [mailing] address for" the minor's father. Goodman had suggested to respondent that, if it was safe, she could "advise him that she no longer wanted to receive [his] mail" and that he should change his mailing address. Goodman wanted to help respondent understand "she had choices around changing," as one of her goals is to help survivors "understand that they do have choices." Goodman testified that this topic first arose toward the end of 2022 or the beginning of 2023. To Goodman's knowledge, the father's mail was still being delivered to respondent's address.

¶ 41    Asked if respondent made progress, Goodman answered that progress "is a relative term" and that since her services "are survivor-driven, progress would be, I guess, in the eyes of the beholder of how the survivor, herself feels."

¶ 42    On cross-examination by the public guardian, Goodman agreed she was concerned that respondent's contact with the father "was more than just mail." Goodman agreed there is a difference between having an understanding of intimate partner violence and putting that knowledge into practice. Goodman was concerned that it was "challenging" or "not safe" for respondent to put that knowledge into practice. Based on what had been shared in family team meetings about the father's behavior, Goodman was concerned that if respondent "attempted to assert boundaries that it might be unsafe for her." Elsewhere in her testimony, Goodman recalled a conversation where respondent indicated that some intimate partner violence is "part of every relationship."

¶ 43    Upon questioning by respondent's counsel, Goodman agreed that respondent was willing to complete services to have the minor returned to her. To Goodman's knowledge, the minor had not experienced any domestic violence.

¶ 44    The trial court proceeded to ask Goodman a number of questions. Goodman testified she had conversations with respondent on a regular basis since September 2022. She agreed respondent was a survivor of domestic violence and that the father was the perpetrator of that violence.

¶ 45    Goodman confirmed that that "from time to time" and as recently as February 2024, respondent had stated that intimate partner violence is a natural part of any relationship. In early 2024, respondent told Goodman about an incident of violence in which the father threatened her with a knife. Goodman did not know when that incident occurred, but she testified that it happened

when the minor's two older siblings were in respondent's care and "in the apartment." Goodman did not know if the minor's siblings observed that incident.

¶ 46  Goodman was not aware whether respondent had ever called the police or sought medical treatment due to the father's violence. Upon further questioning by the court, Goodman confirmed she had concerns that respondent's relationship with the father was "beyond collecting mail." She explained respondent "feels that domestic violence is a normal part of a relationship." Goodman was concerned that "even if [respondent] wanted to turn him away if he came to the home, I don't know if she would be physically able to or willing to."

¶ 47  The State next called Taylon Phelps, a case worker at the Ada S. McKinley Community Services agency. In conjunction with Phelps's testimony, the State offered into evidence a service plan approved in March 2023 and a service plan approved in September 2023. Those exhibits were admitted without objection.

¶ 48  Phelps testified that she was the caseworker for the minor's family from January 2022 to June 2023. Phelps stated she was the family's caseworker prior to the minor's birth in May 2022. Phelps participated in the preparation of the integrated assessment (People's exhibit No. 1) in June 2022.

¶ 49  Phelps recalled that in July 2022, she went to respondent's residence attempting to deliver a bus card to her. After Phelps knocked on the door, she saw the minor's father inside the residence through the window, but he did not open the door. Phelps recognized the father from a photograph on respondent's Facebook page.

¶ 50  Phelps also identified the father as the same person shown being detained on police body camera footage from an incident on January 5, 2021, in which police went to respondent's residence on South Coles Avenue. When the State offered that video (People's exhibit No. 18) into

evidence, respondent's counsel objected on the grounds of relevance and hearsay. Respondent's counsel noted that the January 2021 incident preceded the minor's birth and that the video footage included statements by respondent's mother (the minor's grandmother) and others. The court admitted the exhibit over respondent's objection, finding that it was relevant. However, the court noted that it would disregard hearsay statements.

¶ 51   Also during Phelps's testimony, the State offered into evidence a second portion of body camera footage (People's exhibit No. 17) from another police officer responding to the same January 5, 2021, incident. Again, the court admitted that evidence over respondent's objection but noted that it would disregard hearsay statements in the video.

¶ 52   The body camera footage in those exhibits shows multiple officers entering respondent's home, where they speak with respondent, respondent's mother, and a young adult male identified as respondent's son. In that footage, respondent refers to the father as her boyfriend and states that she has two minor children that are with DCFS due to the father's past behavior. Respondent and her mother describe an altercation between the father and the adult son; they also state that the father threatened them with a knife. Respondent tells the police that the father has multiple knives. Officers subsequently go into a rear bedroom, where they find the father asleep. The footage shows the officers awaken the father, remove two knives from his belt, and remove him from the residence.

¶ 53   In further testimony, Phelps stated she was not able to assess the father for reunification services, despite the agency's efforts to contact him. Phelps testified that public aid records indicated his address was the same as respondent's residence.

¶ 54   Phelps stated that one day in September 2022, the father called her about family time with the minor. At that time, he expressed a desire to undergo an assessment and begin services, but he

did not show up to his scheduled appointment. Phelps last heard from him in October 2022. Phelps explained the agency never recommended that respondent have unsupervised visits with the minor, because "we weren't sure about the relationship between [respondent] and [the father]" or whether the father would be present during any visits with the minor.

¶ 55    In a September 2022 service plan, Phelps rated respondent as "satisfactory" with respect to intimate partner violence counseling, as at that time she was compliant with services and recommendations.

¶ 56    In March or April 2023, Phelps received a parenting capacity assessment from Journey's Community Center. Phelps testified that by the middle of 2023, respondent had not made progress in reunification services. In making that determination, Phelps relied on information from respondent's individual therapist, Lizette Roman.

¶ 57    Phelps recalled she observed at least 10 visits between respondent and the minor in 2023. She described the visits as "fine for the most part," and she did not observe anything concerning. During visits, respondent engaged with the minor, held him, and played with him.

¶ 58    Phelps recalled that respondent frequently asked if visits could occur at her home. Phelps testified that the agency preferred that visits take place elsewhere, as it was not clear whether the father would be present at respondent's home.

¶ 59    Phelps testified that in a number of conversations, respondent "denied any involvement with" the father and stated that "she just get[s] his mail." The last such conversation was in May 2023, before Phelps ceased being the family's case manager.

¶ 60    On cross-examination by the public guardian, Phelps confirmed that after she saw the father in the residence, respondent denied that the father was in her home and told Phelps it "could

have been her landlord." Respondent never admitted to Phelps that she saw the father for anything other than to deliver his mail.

¶ 61 Phelps confirmed that prior to the minor's birth in May 2022, she did not know that respondent was pregnant; respondent had indicated she was no longer involved with the father. The day after the minor was born, Phelps asked respondent about the father. At that time, respondent claimed she had not spoken to him in months.

¶ 62 On questioning by the court, Phelps confirmed that the agency never "exercised discretion for unsupervised visits" between respondent and the minor.

¶ 63 The minor's foster mother, A.H., testified that the minor lived with her since June 7, 2022. She was present during approximately eight visits between respondent and the minor that occurred from approximately August to October 2022. Those visits were set up by the agency. A.H. recalled that respondent asked if the father could attend the visits "without [A.H.] informing the agency" and to "keep it between me and her." A.H. subsequently told the caseworker, Phelps, that she no longer wanted to supervise visits between respondent and the minor.

¶ 64 On cross-examination by the public guardian, A.H. recalled that respondent discussed the father a number of times. Respondent told her that the father "has a short temper and that she know[s] what not to say or do to get him angry." This caused A.H. concern about respondent's request to allow the father to attend visits with the minor.

¶ 65 On examination by respondent's counsel, A.H. testified that she continued to communicate with respondent by text message, providing her with weekly photographs and updates on the minor.

¶ 66 Ann Marie Davis testified that she is a supervisor at the Ada S. McKinley Community Services agency; she supervised Malika Wheeler, the current case worker for the minor's family.

Davis was familiar with the minor's parents. Davis testified that two or three weeks earlier, she had observed respondent and the father walking together into a Dunkin Donuts, but she did not speak to them.

¶ 67    Davis also testified that in March 2024, she and Wheeler went to respondent's residence in order to confirm her address and to complete a home safety checklist. When respondent answered the door, Davis observed what appeared to be dried blood on her nose, fingernails, and clothing, as well as "faint darkness under both eyes." Respondent told Davis she had just gotten up and might have had a nosebleed the prior night. Davis asked respondent for permission to enter the home, but respondent denied the request.

¶ 68    Davis testified that the agency never recommended unsupervised visits between respondent and the minor, based on "safety concerns with any unsupervised contact."

¶ 69    Malika Wheeler testified she became the minor's case worker on April 10, 2023. She testified that over the prior year, she had requested access to respondent's home three times, most recently in March 2024. Wheeler testified that on each occasion she told respondent she wanted to do a home safety check. Each time, respondent denied her access to the home. Respondent told Wheeler that the home was not clean, that she needed to organize it, and the "third time she said that she still hadn't organized it and that the landlord needed to do some work." Wheeler testified the agency wanted to "make sure that the father was no longer in the home," given the history of intimate partner violence.

¶ 70    Wheeler testified that respondent told her that she only saw the minor's father "on occasion to give him his mail" but that he no longer stayed in respondent's home. When asked if she discussed intimate partner violence with respondent, Wheeler testified that respondent indicated her belief that it was "common" as "all relationships had ups and downs."

¶ 71    Wheeler testified that she observed at least ten visits between respondent and minor, which occurred at a library. She noted there were two incidents that she found concerning. She recalled on one occasion, respondent "popped" the minor in the mouth, after the minor put a toy in his mouth. Respondent did not hit him hard, but it was "more of a tap than a touch." When Wheeler told respondent that she could not hit him in that manner, respondent asked "how is she supposed to keep him from putting something in his mouth?" At another visit two or three months later, respondent lightly hit the minor's hand when he put something in his mouth. Wheeler again explained to respondent that this was not appropriate.

¶ 72    Wheeler had no contact with the minor's father, despite her efforts to contact him. Wheeler was not aware of any contact the father had with the minor.

¶ 73    On questioning by respondent's counsel, Wheeler agreed that during the visits she supervised, respondent was nurturing toward the minor, played with him, and told him that she loved him.

¶ 74    The court proceeded to ask Wheeler additional questions, inquiring exactly what respondent said about any violence in her relationship with the father. Wheeler testified that respondent never explicitly stated there was physical violence but said that she and the father had "ups and downs" and "every relationship has these issues."

¶ 75    Following Wheeler's testimony, the court received into evidence copies of the February 2018 adjudication orders finding the minor's two older siblings neglected due to injurious environment, and the April 2018 dispositional order finding respondent unable to care for those two minors. The court also admitted the April 2022 letters of office for private guardianship and the closing order for the siblings' cases. The court also admitted respondent's medical records reflecting a domestic violence incident in 2017. The State then rested.

¶ 76    Respondent's counsel called respondent and asked her a single question: whether she was at Dunkin' Donuts with the father two or three weeks earlier. Respondent answered, "Never."

¶ 77    Respondent also offered into evidence a parenting capacity assessment from July 2019, which was admitted.

¶ 78                                    Unfitness Ruling

¶ 79    On July 29, 2024, the court rendered its findings as to unfitness.

¶ 80    As to the father, the court found the State met its burden of proof showing he was unfit within the meaning of grounds (a), (b), (c), (m), and (n) under section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2024).

¶ 81    With respect to respondent, the court found her unfit under grounds (b) and (m) of section 1(D) of the Adoption Act. Under ground (m)(ii), it found she failed to make reasonable progress or efforts to correct the condition that brought the minor into the care of the State for the two nine-month periods identified by the State. See *id.* § 1(D)(m)(ii).

¶ 82    In doing so, the court recognized that the adjudication order in the minor's case was based on the finding that respondent remained in a domestic violence relationship with the father, which had led to the removal of two older siblings. The trial court remarked that the evidence showed respondent continued her relationship with the father. It noted respondent referred to the father as her boyfriend in the body camera footage from the January 2021 incident. The court noted that several months later, she became pregnant with the minor, who was born in May 2022. The court also noted Phelps's testimony that she was not aware that respondent was pregnant until the minor's birth, after which respondent claimed the relationship had ended. The court also credited Phelps's testimony that she saw the father at respondent's home in July 2022.

¶ 83    The trial court also referenced the March 2023 parenting capacity assessment, in which respondent acknowledged she had "ongoing flings" with the father. In that assessment, respondent also indicated that intimate partner violence was a normal part of every relationship. The court also referenced the June 2023 psychological evaluation that recommended domestic violence services because of respondent's inability to choose healthy relationships. The trial court also referenced Goodman's testimony, including her reference to respondent's belief that violence was a part of any relationship.

¶ 84    The trial court noted that even if it disregarded the testimony of the three agency workers, there was other unrebutted evidence indicating that she remained in a relationship with the father and that violence continued.

¶ 85    Citing respondent's "failure to take responsibility for parenting through the entirety of this case," the trial court also found respondent unfit on ground (b). That is, it found her unfit due to "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." *Id.* § 1(D)(b). The court declined to find the State proved respondent unfit due to any mental health condition, pursuant to ground (p). See *id.* § 1(D)(p).

¶ 86    The court emphasized it was not finding that respondent was unloving to the minor. Rather, it found she "has been provided the education and support to leave a domestic violence relationship" but she was "unwilling or emotionally unable to do that."

¶ 87                         Best Interests Hearing

¶ 88    On September 12, 2024, the court conducted a best interests hearing. The minor's caseworker, Wheeler, testified that the minor was now two years old and resided with a foster mother and the foster mother's teenage daughter. Wheeler observed the minor in the home three

times a month. She found the home to be safe and appropriate. Wheeler observed that the minor was very affectionate and attached to the foster mother.

¶ 89    The minor was in day care, which was going well. Wheeler had visited the day care and spoke to the minor's teachers. The minor was in speech therapy and occupational and developmental therapy and was making progress in his ability to speak, walk, and run. The agency was in the process of getting a social worker to assess whether the minor needed a behavior therapist after the foster parent expressed some concern. Wheeler had not observed anything "overly concerning" in her observations of the minor's behavior, which she believed was typical for a two-year-old.

¶ 90    Wheeler testified that her agency recommended the termination of the father's and respondent's parental rights so that the minor could be adopted by his foster mother. Wheeler noted the minor had been in the home since birth and he was bonded to the foster mother. Wheeler acknowledged the foster mother indicated a desire to move to Indiana after adopting the minor, but the foster mother still planned to allow respondent to have contact with the minor even after a move.

¶ 91    Upon cross-examination by respondent's counsel, Wheeler agreed that respondent was loving, affectionate, and attentive toward the minor during her visits. She agreed there was a bond between respondent and the minor and that the visits were positive overall. She acknowledged the foster mother did not have contact with the minor's older siblings.

¶ 92    The court proceeded to ask Wheeler a number of questions. In response to the court's questions, Wheeler confirmed the minor's two older siblings' cases were "closed out" and that the minor had never had a visit with those siblings. Wheeler confirmed the foster mother indicated her

willingness to continue to provide respondent with pictures and updates regarding the minor, and to allow respondent to visit the minor on his birthday and on certain holidays.

¶ 93    The foster mother, A.H., also testified at the best interests hearing. She testified that she had taken care of the minor since he was 14 days old. The minor was engaged in physical, occupational, developmental, and speech therapy at his day care. A.H. testified that she also lived with her 15-year-old daughter, and the minor was affectionate towards both of them.

¶ 94    A.H. stated that she loved the minor and wished to adopt him. She testified that if she adopted the minor, she would not keep respondent from having a relationship with him. She believed it was important for the minor to maintain a bond with respondent.

¶ 95    Elsewhere, A.H. testified she was planning an eventual move to Marion, Indiana, which was approximately a three-hour drive from Chicago. She indicated that even after a potential move, she would be willing to help arrange for respondent to visit the minor during trips back to Chicago.

¶ 96    Following argument, the court found that "physical safety weighs heavily" in favor of termination of both the father's and respondent's parental rights, again noting the history of domestic violence. The court noted that although respondent was "kind and loving" during visits, it believed she presented a risk to the minor's safety due to the domestic violence relationship. The court also noted that the foster mother met all of the minor's needs and that he was bonded to her. It also credited the foster mother's testimony that she intended to facilitate a continued relationship between minor and respondent.

¶ 97    The court entered a corresponding written order terminating the father and respondents' parental rights and appointing a guardian with the right to consent to adoption of the minor. The court also entered a permanency order with a goal of adoption. Respondent filed a timely notice of appeal from the order terminating her parental rights.

¶ 98                                    ANALYSIS

¶ 99   On appeal, respondent posits two types of errors that she believes warrant a new termination hearing. First, she argues that the trial court erred when it engaged in extensive *sua sponte* questioning of witnesses at the termination hearing and the best interests hearing. In doing so, she claims the trial court improperly "took on the prosecutor's role" and violated respondent's rights. She acknowledges this was not preserved in the trial court but urges that the court's questioning was plain error.

¶ 100   Alternatively, respondent asserts the court erred in granting the State's motion *in limine* that permitted it to elicit testimony from Goodman, respondent's domestic violence counselor. That is, she maintains the testimony violated the privilege provided by the Domestic Violence Act, notwithstanding the provision of the Juvenile Court Act that "The privileged character of communication between any professional person and patient or client, except privilege between attorney and client, shall not apply to proceedings subject to this Article." 705 ILCS 405/2-18(4)(e) (West 2024). Without Goodman's testimony, she posits, the State could not meet its burden to prove unfitness and terminate her parental rights.

¶ 101   For the following reasons, we reject respondent's contentions and affirm.

¶ 102   "The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2016)) provides for the termination of parental rights in a two-step process." *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26. "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). A finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27.

¶ 103   After a parent is deemed unfit, the court must conduct a second hearing to determine if termination of parental rights is in the child's best interests. *In re A.R.*, 2023 IL App (1st) 220700, ¶ 77; 705 ILCS 405/2-29(2) (West 2024). "The State has the burden of proving that it is in the child's best interest to terminate parental rights by a preponderance of the evidence." *N.T.*, 2015 IL App (1st) 142391, ¶ 28. The Juvenile Court Act enumerates a number of factors that must be considered when determining whether termination of parental rights is in the minor's best interests, which include the physical safety and welfare of the child, the child's sense of attachments, "the child's need for permanence," and "the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2024). The trial court's best interest determination need not contain an explicit reference to each of these factors. *N.T.*, 2015 IL App (1st) 142391, ¶ 28. "A reviewing court will not reverse a trial court's decision to terminate parental rights unless it is contrary to the manifest weight of the evidence." *A.R.*, 2023 IL App (1st) 220700, ¶ 77.

¶ 104   Notably, respondent does not argue that the court's findings at the unfitness and best interests hearings were against the manifest weight of the evidence. Instead, her claims of error pertain to (1) the court's decision to engage in *sua sponte* questioning of certain witnesses and (2) its decision to admit certain evidence.

¶ 105      Whether the Court Erred in Its Questioning of Goodman, Phelps, and Wheeler

¶ 106   We first address respondent's claim that the trial court erred when it engaged in *sua sponte* questioning of three witnesses. Specifically, the court asked questions of Goodman and Phelps at the termination hearing and of Wheeler at the best interests hearing.

¶ 107   With respect to each of these three witnesses, respondent claims that the trial court erred because it "took on the role of the prosecutor" in its questioning. Further, respondent suggests that the court's questioning of these witnesses elicited inadmissible evidence.

¶ 108 At the outset, we note (as respondent acknowledges) that her counsel never raised an objection to the trial court's *sua sponte* questioning. "Generally, an issue that was not objected to during trial and raised in a posttrial motion is forfeited on appeal." *N.T.* 2015 IL App (1st) 142391, ¶ 41 (citing *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25).

¶ 109 Respondent argues that regardless of any forfeiture, we should nonetheless consider this claim of error under the plain error doctrine. However, we need not delve into the plain error doctrine to review the merits of respondent's claim, as we recognize that "application of the forfeiture rule is less rigid when the basis of the objection is the trial court's conduct." *Id.* (citing *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25). " 'Specifically, where the trial court departs from its role and becomes an advocate for the State's position, no objection by opposing counsel is necessary to preserve the issue for review.' " *Id.* (quoting *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000)). Thus, in *N.T.*, we found no forfeiture and reviewed the appellant mother's claim that the trial court assumed the role of an advocate when it asked questions of a witness at a best interest hearing, notwithstanding the lack of an objection. *Id.* Under the same principle, we do not find forfeiture applies to respondent's arguments concerning the trial court's questioning of Goodman, Phelps, and Wheeler.

¶ 110 Having determined no forfeiture, we turn to the merits of the claims. This court has held that the propriety of a trial court's *sua sponte* questioning of a witness in a Juvenile Court Act proceeding is reviewed under an abuse of discretion standard. *Id.* (citing *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 21). " 'Under the abuse of discretion standard, the reviewing court must determine whether the circuit court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles

of law so that substantial prejudice resulted.' " *Id.* (quoting *In re D.M.* 336 Ill. App. 3d 766, 772 (2002)).

¶ 111   "Generally, '[a] trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues.' " *Id.* ¶ 42 (quoting *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26).

¶ 112   Further, section 1-2 of the Juvenile Court Act instructs that "[i]n all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 ILCS 405/1-2(2) (West 2024).

> "Thus, under the Juvenile Court Act, *** the court cannot sit passively and await the parties' presentation of evidence. Instead, the Act requires that it must act affirmatively, and perhaps at times aggressively, to ferret out information before it can decide that a child's interest is better served by removal from the family." (Internal quotation marks omitted.) *N.T.*, 2015 IL App (1st) 142391, ¶ 42.

¶ 113   A trial judge has " 'wider latitude in examining witnesses' " at a bench trial, " 'where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder.' " *Id.* ¶ 43 (quoting *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26). "However, 'the trial court must not depart from its function as a judge and may not assume the role as an advocate for either party.' " *Id.* ¶ 43 (quoting *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26).

¶ 114   The propriety of the court's examination must be determined by the circumstances of each case and rests within the discretion of the trial court. *Id.* In this context, "A court abuses its discretion when it adopts the role of advocate for one of the parties and prejudices the opposing party." *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 36. "To establish prejudice in a bench trial, the

aggrieved party must show 'the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence.' " *Id.* (quoting *People v. Smith*, 299 Ill. App. 3d 1056, 1063 (1998)).

¶ 115   After reviewing the relevant portions of the record, we do not find the court abused its discretion with respect to its questioning of Goodman, Phelps, or Wheeler. Nor do we find that the court's questioning of these witnesses elicited inadmissible evidence that could constitute reversible error.

¶ 116   As to Goodman, respondent's domestic violence counselor, we recognize that the trial court asked numerous questions that took up approximately seven pages of transcript. Yet, the transcript reflects these were largely questions to confirm or clarify key aspects of Goodman's prior testimony. For example, the court asked Goodman to confirm whether and when respondent had indicated that intimate partner violence was a "natural part of any relationship." Similarly, the court asked Goodman follow-up questions to clarify the basis of her prior testimony referring to respondent as a survivor of domestic violence, including whether the father was the perpetrator of that violence. It also inquired if Goodman knew how recently the violence had occurred and whether the father threatened or committed such violence in the presence of the minor's older siblings. Similarly, the court asked Goodman to elaborate on the basis for her prior expressed concern that respondent's relationship with the father went beyond collecting his mail. This elicited Goodman's professional opinion that she was concerned that respondent would not be "physically able to or willing" to turn the father away from her home.

¶ 117   Although respondent characterizes this as taking on the role of a "prosecutor," we think it is more accurately viewed as the court acting under its statutory authority to gather information to accurately assess whether domestic violence rendered the minor's parents unfit to protect him. See

705 ILCS 405/1-2(2) (West 2024) (trial court may "direct the course" of proceedings to "gather information bearing upon the current condition and future welfare of persons subject to this Act"). In this case, these questions went to the heart of the State's basis for alleging parental unfitness, *i.e.*, the continued presence of a domestic violence relationship. In so doing, we do not believe the court was acting as the State's advocate. Rather, the court was exercising its discretion to ask Goodman pointed questions to clarify the basis for her prior expressed statements and opinions about this crucial topic. This was consistent with its role as fact finder and neutral decision-maker.

¶ 118   We turn to respondent's contention that the trial court "circumvented the rules of evidence" when it questioned Goodman "about her professional opinion that [father] was the perpetrator of domestic violence *** and that [respondent] told Ms. Goodman that [father] attacked [respondent] with a knife in the residence" while the minor's older siblings were present.

¶ 119   Respondent cites section 2-18 of the Juvenile Court Act, which provides that "the rules of evidence in the nature of civil proceedings in this State are applicable to proceedings under this Article." *Id.* § 2-18(1). Notably, however, respondent's opening brief fails to cite any specific rule of evidence or other authority to articulate why the testimony elicited was inadmissible. A point raised in a brief but not supported by citation to relevant authority is forfeited. See *People v. Ward*, 215 Ill. 2d 317, 332 (2005); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 120   In any event, even assuming *arguendo* that the court's line of questioning elicited inadmissible evidence, such evidence was cumulative of other evidence that was admitted at the fitness hearing without objection. "[W]hen erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless." (Internal quotation marks omitted.) *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39; see *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 90 ("the erroneous admission of hearsay

evidence is harmless error where it is merely cumulative of other, properly admitted, evidence in the record").

¶ 121 Wholly apart from the court's questioning of Goodman, there was ample independent evidence of the history of domestic violence perpetrated by the father against respondent, both in documentary evidence and other witness testimony at the fitness hearing. And witnesses other than Goodman offered independent testimony tending to show that respondent remained in a relationship with the father. Phelps testified that she saw the father in respondent's house in July 2022 (less than two months after the minor's birth), despite respondent denying any relationship. Davis testified that she saw respondent and father together weeks before the termination hearing. Both Phelps and Davis testified that respondent denied them entry into her home, including a time when respondent appeared to have dried blood on her. And the foster mother, A.H., testified that respondent asked her to allow the father to attend visits with the minor without informing the agency. There was ample proof of the continuing risk of domestic violence, regardless of whether the court asked the additional questions of Goodman. In short, we cannot say that the court's *sua sponte* questioning of Goodman elicited any non-cumulative, prejudicial evidence.

¶ 122 We similarly reject respondent's claim of error, to the extent it relies on the court's questioning of Phelps at the fitness hearing. Respondent takes issue with the court's questions concerning respondent's therapy and whether the agency approved of unsupervised visits. Specifically, the court asked Phelps:

"[THE COURT]: Okay. You stated that mother engaged in

therapy, correct?

A. Yes.

Q. And did you receive quarterly therapy reports from her therapist?

A. I received one report from her therapist.

Q. Okay. Approximately when was that?

A. That was in about March of 2023.

Q. Did you ever talk to the therapist on the phone regarding [respondent's] progress?

A. Yes.

Q. And did you take into consideration *** the therapist's report and phone conversation when you rated [respondent] on the family service plan that you completed in March of 2023?

A. Yes.

[Respondent's hearsay objection overruled.]

BY THE COURT:

Q. Is there anything else that you took into consideration when you rated [respondent] on other progress in therapy? Aside from the therapist's report and the therapist's statements?

A. No.

Q. Okay. Just out of curiosity, after—after [the minor's two older siblings'] cases were closed—

A. Uh-huh.

Q.—did [the minor] continue to have sibling visits? ***

Did [the minor] continue to have sibling visits arranged by the

agency?

A. They were—they—we did not have any sibling visits.

Q. Okay. At any point during [the minor's] case, did the

agency exercise discretion for unsupervised visits?

A. No."

¶ 123   Contrary to respondent's suggestion, we do not find these questions were prosecutorial in nature or that the trial court abandoned its role as a neutral arbitrator in asking them. In its questions about respondent's therapy, the court was permissibly exercising its discretion to seek clarification regarding the basis for Phelps's prior testimony, as well as the March 2023 service plan. Similarly, we do not find anything improper or prosecutorial about the court asking Phelps whether the minor had unsupervised visits with respondent. This was plainly a relevant topic, and a reasonable exercise of the court's authority to direct proceedings so as to "gather information bearing upon the current condition and future welfare of" the minor. See 705 ILCS 405/1-2(2) (West 2024).

¶ 124  We also are unpersuaded by respondent's claim that such questions to Phelps "circumvent[ed] the rules of evidence." Again, respondent's brief fails to cite any specific rule of evidence or case to articulate why any of the testimony was inadmissible. In any event, as the public guardian points out, the testimony elicited by the court's questioning of Phelps was cumulative of other evidence. Specifically, respondent's lack of progress in therapy was documented in the March 2023 service plan prepared by Phelps, which was admitted into evidence without objection. Further, even before the court's questions, Phelps had already testified that the agency never recommended unsupervised visits between respondent and the minor.

¶ 125 This brings us to the trial court's *sua sponte* questions to Wheeler at the best interests hearing. In that questioning, the court asked Wheeler to confirm whether the foster mother had indicated her willingness to permit respondent to maintain contact with the minor, even after a potential adoption and move to Indiana. The court also asked Wheeler a number of questions surrounding a lapse in respondent's in-person visits with the minor, after respondent underwent foot surgery in April 2024. In that questioning, the court asked Wheeler about what respondent said prior to the surgery as to how long she expected to be unable to visit. The court also asked Wheeler how it came to be that in-person visits resumed on July 29, 2024. This led to Wheeler's testimony that she sent respondent a text message about resuming visits in June 2024, but the visits resumed only after Wheeler spoke to respondent's counsel the next month.

¶ 126 Once again, we find nothing "prosecutorial" about this. As a neutral arbitrator and fact finder at the best interests hearing, it was totally reasonable for the court to seek clarification about the timing and reason for any lapse in respondent's in-person visitation of the minor.

¶ 127 Similarly, we are unpersuaded by respondent's suggestion this was reversible error because the topic of whether she told the agency "she was unable to have in-person visits was a matter not previously in evidence and beyond the scope of the State's direct examination." Respondent urges that, as a result of its questions, the trial court elicited and "considered evidence in its ruling that was never part of the record *** except for its *sua sponte* participation in the proceedings."

¶ 128 This is unconvincing. We note that respondent does not cite to any case suggesting it is improper—especially at the best interests hearing stage—for the court to elicit testimony beyond the scope of direct examination. Indeed, this court has held that the rules of evidence at a best interests hearing upon a termination petition are "substantially relaxed," just as they are at a dispositional hearing under the Juvenile Court Act. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶¶ 58-

61. This court agreed with a Fourth District decision that "a dispositional hearing and a best-interests hearing are functional equivalents, and as such both types of hearings 'are subject to the same relaxed standard regarding the admission of evidence—that is, the formal rules of evidence do not apply.' " *Id.* ¶ 60 (quoting *In re Jay H.*, 395 Ill. App. 3d 1063, 1069-70 (2009)).

¶ 129   In any event, even assuming that it was somehow improper to elicit testimony about the temporary lapse in respondent's visitation following her foot surgery, it is clear that this had no impact on the court's ultimate determination to terminate parental rights and allow the minor to be adopted. In rendering its decision, the court made clear that it found respondent was "kind and loving to her son," yet it believed the risk of domestic violence remained a threat to the minor's safety:

> "But to say that she is not a risk to her child, I disagree. The whole reason I found [respondent] to be unfit to begin with was based on the fact that he was adjudicated neglected because of the domestic violence relationship between the parents, and that the mother had not made any meaningful progress *** to end that relationship. And so I am concerned about [the minor's] safety if he were to be in the care of his mother. So physical safety weighs heavily in favor of termination ***."

The court otherwise explained that the minor was bonded to his foster mother, who cared for him since he was 14 days old. In short, the testimony elicited on the court's *sua sponte* questioning of Williams had no impact on its ultimate determination. In turn, that cannot serve as a basis for reversal. See *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28 ("If the trial court

commits an abuse of discretion in allowing the admission of evidence, we will order a new trial only if admission of the evidence appears to have affected the outcome of the trial.").

¶ 130   For the foregoing reasons, we reject respondent's claims that we should reverse based on the trial court's *sua sponte* questioning of Goodman, Phelps, and Wheeler.

 ¶ 131   Goodman's Testimony Was Admissible Under the Exceptions to the Privilege Set Forth in Section 227 of the Domestic Violence Act

¶ 132   We turn to respondent's argument that the trial court erred in granting the State's motion *in limine* to allow it to elicit testimony from Goodman, her domestic violence services counselor. In so doing, the trial court agreed with the State that Goodman's testimony was admissible pursuant to section 2-18 of the Juvenile Court Act (705 ILCS 405/2-18(4)(e) (West 2024)), notwithstanding the privilege otherwise provided under the Domestic Violence Act (750 ILCS 60/227 (West 2024)).

¶ 133   Generally, the admission of evidence is reviewed under the abuse of discretion standard. *McHale*, 2015 IL App (1st) 132625, ¶ 28. However, the trial court's ruling in this case turned upon its interpretation of the relationship between the above-noted statutory provisions. "Issues of statutory interpretation are questions of law, subject to *de novo* review." *McHenry Township v. County of McHenry*, 2022 IL 127258, ¶ 55. We also note that a court of review may affirm a trial court's judgment upon any ground appearing in the record, regardless of whether it was relied upon by the trial court and regardless of whether the reasoning of the trial court was correct. See *In re Marriage of Kranzler*, 2018 IL App (1st) 171169, ¶ 66.

¶ 134   In relevant part, the Domestic Violence Act states that:

> "No domestic violence advocate or counselor shall disclose any confidential communication or be examined as a witness in any civil or criminal case or

proceeding *** without the written consent of the domestic violence victim except (1) in accordance with the provisions of the Abused and Neglected Child Reporting Act or (2) in cases where failure to disclose is likely to result in an imminent risk of serious bodily harm or death of the victim or another person." 750 ILCS 60/227(b) (West 2024).

¶ 135    The trial court determined that this privilege did not apply to bar Goodman's testimony in this case due to operation of section 2-18 of the Juvenile Court Act, which provides that "The privileged character of communication between any professional person and patient or client, except privilege between attorney and client, shall not apply to proceedings subject to this Article." 705 ILCS 405/2-18(4)(e) (West 2024). The parties acknowledge that a hearing upon a petition to terminate parental rights is a proceeding subject to article II of the Juvenile Court Act. See *id.* § 2-29(2).

¶ 136    The trial court admitted Goodman's testimony after determining that section 2-18 of the Juvenile Court Act carved out an exception to the privilege found in section 227 of the Domestic Violence Act. Notably, the parties did not argue, and the trial court did not discuss, whether either of the exceptions *within* section 227 of the Domestic Violence Act independently applied.

¶ 137    Respondent urges section 227 of the Domestic Violence Act controlled and precluded Goodman from testifying without respondent's consent, notwithstanding section 2-18 of the Juvenile Court Act. Specifically, respondent posits that these provisions are in apparent conflict, then relies on the principle that "when two conflicting statutes cover the same subject, the specific governs the general." (Internal quotation marks omitted.) *Kloeppel v. Champaign County Board*, 2022 IL 127997, ¶ 22. Respondent proceeds to argue that section 227 of the Domestic Violence

Act controls in this situation, because it is "more narrowly tailored" than section 2-18 of the Juvenile Court Act.

¶ 138  The public guardian and the State urge that the trial court correctly held that section 2-18 of the Juvenile Court Act constitutes an exception to the privilege in section 227 of the Domestic Violence Act. They rely on the principle that courts strive to construe statutes in a harmonious manner. See *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002) ("Even when an apparent conflict between statutes exists, they must be construed in harmony with one another if reasonably possible.").

¶ 139  We affirm the trial court's decision to permit Goodman's testimony, although we differ from the trial court's stated reasoning. Specifically, we find that Goodman's testimony was admissible under either of the enumerated exceptions within section 227 of the Domestic Violence Act. 750 ILCS 60/227(b) (West 2024) (specifying exceptions for the domestic violence counselor privilege "in accordance with the provisions of the Abused and Neglected Child Reporting Act or (2) in cases where failure to disclose is likely to result in an imminent risk of serious bodily harm or death of the victim or another person"). That is, Goodman's testimony was admissible under section 227 of the Domestic Violence Act, regardless of application of section 2-18 of the Juvenile Court Act. This obviates any need to delve into any apparent conflict between the two statutes.

¶ 140  "The cardinal rule of interpreting statutes *** is to ascertain and give effect to the true intent and meaning of the legislature." *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311 (2001). "The statutory language is the best indicator of legislative intent, and that language must be given its plain and ordinary meaning." *People v. Sevedo*, 2017 IL App (1st) 152541, ¶ 22.

¶ 141  Although not discussed by the parties or the trial court, either of the exceptions within section 227 of the Domestic Violence Act applied to permit Goodman's testimony in the

underlying proceeding. First, section 227(b)(1) expressly permits a domestic violence advocate or counselor to disclose confidential information and be examined as a witness in a civil (or criminal) proceeding absent the domestic violence victim's written consent "in accordance with the provisions of the Abused and Neglected Child Reporting Act." 750 ILCS 60/227(b)(1) (West 2024). Under the Abused and Neglected Child Reporting Act, DCFS may offer protective services and utilize the services of agencies to prevent any further harm to children who are reported abused and neglected, so as to preserve the family. 325 ILCS 5/2, 8.2 (West 2024). Here, consistent with that provision, and reading it together with article II of the Juvenile Court Act, on learning that the minor had been born into respondent's home subject to domestic violence, DCFS ordered that respondent engage in therapy. Respondent was to address and correct domestic violence issues in order to regain custody of the minor and prevent harm to the child. See *id.*; 705 ILCS 405/2-10(9) (West 2024); see also 325 ILCS 5/4(g) (West 2023) (noting, "[t]he privileged quality of communication between any professional person required to report and the professional person's patient or client shall not apply to situations involving abused or neglected children"). Incidentally, this subsection (b)(1) exception is also harmonious with section 2-18 of the Juvenile Court Act, which clearly permits a psychologist to testify regarding privileged information involving her patient in an article II juvenile court proceeding. And, it would be absurd for the Domestic Violence Act to waive the privilege under the Abused and Neglected Child Reporting Act but not the Juvenile Court Act. See *Dawkins v. Fitness International*, *LLC*, 2022 IL 127561, ¶ 27 ("statutes must be construed to avoid absurd results"). Thus, this analysis shows the Abused and Neglected Child Reporting Act, which is cited in section 227(b)(1) of the Domestic Violence Act, and the Juvenile Court Act work in conjunction together to right the wrongs done to abused and neglected children.

¶ 142   Second, and even more significant, section 227(b) of the Domestic Violence Act states another exception to the privilege rule, namely, in cases where not disclosing the confidential information could result in "an imminent risk of serious bodily harm" to "another person." 750 ILCS 60/227(b)(2) (West 2024). Under this subsection, the legislature made clear that where a person other than the domestic violence victim may be at serious risk, a domestic violence advocate or counselor "shall" disclose confidential communication and be examined as a witness in a legal case or proceeding without the victim's consent. *Id.* This is representative of the situation at hand. That is, given that DCFS took protective custody of the minor at his birth due to domestic violence in the home, and respondent never achieved unsupervised visitation despite years of DCFS services, allowing Goodman's testimony to establish respondent's unfitness lands squarely within the exception presented in section 227(b)(2) of the Domestic Violence Act. *Id.* The failure to present Goodman's otherwise privileged testimony would risk returning the minor to the home where domestic violence clearly still existed, creating "an imminent risk of serious bodily harm" to him, which subsection (b)(2) was precisely enacted to prevent. *Id.*

¶ 143   In short, we conclude that both of the exceptions within section 227(b) of the Domestic Violence Act applied to permit the admission of Goodman's otherwise privileged testimony. That is, her testimony was admissible on the face of the Domestic Violence Act, regardless of application of section 2-18 of the Juvenile Court Act. In turn, we have no need to assess the parties' arguments as to whether there is an apparent conflict between these two statutes, or whether the trial court's ruling properly resolved any such conflict. We simply hold that Goodman's testimony was admissible under section 227 of the Domestic Violence Act. Accordingly, we reject respondent's claim of error with respect to the ruling on the State's motion *in limine* and the admission of Goodman's testimony.

¶ 144   Finally, we note respondent's claim that, without Goodman's testimony, the State "did not satisfy its burden of proving unfitness based on the manifest weight of the evidence standard." Respondent suggests that, absent Goodman's testimony, there was insufficient evidence of domestic violence perpetrated by the father against respondent to sustain the findings of unfitness. As we have concluded that Goodman's testimony was admissible, this argument is rendered moot. In any event, we note that even apart from Goodman's testimony, there was ample documentary and testimonial evidence that supported the court's findings pertaining to the domestic violence between respondent and the father and its corresponding findings of unfitness.

¶ 145                              CONCLUSION

¶ 146   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 147   Affirmed.

---

### *In re W.N.K.*, 2025 IL App (1st) 242008

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-JA-00414; the Hon. Jennifer Payne, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Frank M. Adams, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for other appellee. |

---