2025 IL App (1st) 250413-U

FIFTH DIVISION
September 26, 2025

No. 1-25-0413

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| In re the Interest of M.D. and M.B., | ) | |
| | ) | |
| Minors-Respondents-Appellees | ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| (People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 20 JA 1533 |
| | ) | 20 JA 1534 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| Porchia B., | ) | Sybil Thomas, |
| | ) | Judge, presiding. |
| Mother-Respondent-Appellant.) | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The judgment of the trial court is affirmed. The trial court's unfitness finding was not against the manifest weight of the evidence, and the appellant does not challenge the court's best interest finding. We therefore affirm the trial court's decision to terminate appellant's parental rights.

¶ 2                                 I. BACKGROUND

¶ 3   Porchia B. has two children: M.D., who was born on February 26, 2012, and M.B., who was born on December 26, 2018. On April 28, 2020, M.D. and M.B.'s relative called the police

after Porchia struck M.D.. Criminal charges were filed against Porchia and a no contact order was entered, which prohibited Porchia from having any contact with M.D.. After the Department of Children and Family Services (DCFS) indicated Porchia for "substantial risk of physical injury/environment injurious to health and welfare," M.D. and M.B. were removed from her care and placed with their maternal great-grandmother, Ethel. The family was referred to Intact Family Services, which referred Porchia to parenting classes and her and her children to counseling services.

¶ 4    An Integrated Assessment (IA) was completed by DCFS on July 2, 2020. The IA noted that Porchia completed high school and vocational training, was able to work, take care of her own basic needs, make meals, pick up the children from school, and ensure doctor appointments were scheduled and attended. Porchia said she was homeless but was approved for low-income housing in Iowa and would be moving soon.  The IA noted that Porchia would benefit from a psychological assessment and a parenting capacity assessment due to her past diagnosis of bipolar disorder, difficulty staying on topic and expressing herself, and not understanding the reason her case came to DCFS. The IA indicated that Porchia was referred for intact family services, parenting classes, and counseling services.

¶ 5    A November 6, 2020, report written by Addictions Counselor Zoe Ladis states that Porchia was unsuccessfully discharged from substance abuse treatment due to "lack of compliance and low attendance." It notes that Porchia had completed only 3 of the required 75 hours of treatment, missed 8 group sessions, and tested positive for cannabinoids on an October 2020 toxicology screen.

¶ 6    On November 13, 2020, the State filed a Petition for Adjudication of Wardship for M.D. and M.B. as well as a motion for temporary custody. It alleged that M.D. reported that Porchia hit

him on multiple occasions and that Porchia was diagnosed with schizoaffective disorder and bipolar disorder. It also alleged that Porchia not engaged in recommended mental health treatment or taking prescribed medications in April 2020, and that services had been recommended to Porchia, including a psychological assessment, mental health services, individual therapy, a parenting capacity assessment, and a substance abuse assessment and substance abuse treatment, but Porchia had been unsuccessfully discharged from the parenting class and had failed to engage in a mental health evaluation.

¶ 7    On November 19, 2020, a psychological evaluation and parenting capacity assessment completed by clinical psychologist Dr. Michelle Iyamah was submitted to the court. Dr. Iyamah noted that Porchia tested at the borderline range for many of the cognitive and intellectual tests. She also noted that Porchia reported a prior diagnosis of bipolar disorder, and found that it continued to be the appropriate diagnosis given Porchia's current confusion and psychotic-level thoughts. She noted that Porchia denied taking any medications and claimed she "do[es]n't need no meds" even though "continued psychosis is apparent." Porchia also reported that she smokes marijuana and drinks alcohol. While Porchia acknowledged she was supposed to engage in substance abuse treatment, she said she "does not feel as though she needs to", she was "not ready to go through more drug testing and treatment," and if she "want[s] to go out and party, [she] will." Dr. Iyamah concluded that Porchia's refusal to participate in substance abuse treatment or provide any further urine drops "suggests that she is apt to be continuing her substance use."

¶ 8    In the parenting capacity portion of the assessment, Dr. Iyamah noted that Porchia admitted that she "whoop[ed]" M.D. and said he "needs to be whooped" every day and "broke down into pieces" or he will be out of control. Based on this comment, Dr. Iyamah concluded that Porchia "harbours a belief that corporal punishment is necessary." Porchia had been referred to parenting

classes but was dismissed due to a lack of participation, and she told Dr. Iyamah that "no one [could] force her to [participate in parenting classes], or keep her from her children." When Dr. Iyamah asked her if she could consider different ways to parent, Porchia said, "I'm not gonna listen to anything that anyone got to say." As part of the assessment, Dr. Iyamah observed Porchia with her children for about an hour, and noticed that Porchia tended to focus on M.B. and ignore M.D.. She also found that Porchia "appeared emotionally needy, wanting more from the boys than she gave" and "offered affection only to [M.B.]."

¶ 9     In sum, Dr. Iyamah opined that Porchia "cannot provide minimally adequate parenting", that "she would pose a danger to her children should they be reunified" and that "[g]iven her attitude towards undergoing services and poor response to following through with recommendations from her worker, she is unlikely to be able to become an able parent in a reasonable time period." The report recommended that Porchia 1) engage in individual therapy; 2) obtain a more thorough evaluation of her substance abuse needs; and 3) complete a psychiatric assessment and start taking psychotropic medication. The report also recommended that Porchia locate stable housing, become financially stable, comply with psychiatric and therapy services, and cease substance abuse before her children could be returned to her.

¶ 10    On November 19, 2020, the trial court found probable cause that the children were abused or neglected and that an immediate and urgent necessity existed to remove the children from their home. It found that "[Porchia] needs to be assessed for, participate in, and make progress in services" and that if the no contact order was lifted, supervised visits between Porchia and M.D. could be implemented.

¶ 11    A DCFS Service Plan dated October 28, 2021, and approved on November 2, 2021, states that Porchia "is in need of a psychiatric evaluation based on her history of mental illness. It is

difficult for [the] agency to get in contact with [Porchia] due to her severe mental health issues and not being on medication." It notes that Porchia's case worker provided her with resources to complete a psychiatric evaluation and referred her to Avance Counseling Center for parenting classes. It indicated that Porchia still had unstable housing but was working at a temp agency.

¶ 12     At an adjudication hearing on March 28, 2022, the court found that M.D. and M.B. were abused and neglected under section 405/2-3(1)(b) of the Juvenile Court Act of 1987 based on an injurious environment and section 405/2-3(2)(i) due to physical abuse. The order states, "[Porchia] failed to complete all recommended intact services. [Porchia] did not have the capacity to meet minimum parenting standards, was a danger to her children and was experiencing psychosis."

¶ 13     A family plan dated April 18, 2022, states that Porchia has "not completed any services, or been involved with the case." It notes that Porchia's case worker last had contact with her on March 22, 2022, but Porchia "appeared to be unstable during [the] phone call. [She] yelled at [her caseworker] and called her a bitch. [Porchia] stated to [her caseworker] to never get in contact with her again." The plan noted that Porchia has a "limited understanding" when it comes to parenting and the impact of her behavior on her children. It found that Porchia "is in need of a psychiatric evaluation based on her history of mental illness." It also noted that it was "difficult for [DCFS] to get in contact with [Porchia] due to her severe mental health issues and not being on medication." Porchia had not had any visitation with M.D. or M.B., but would check in with their foster parent once or twice a month via phone to see how the children were doing. M.D. "expressed often that he wants [his foster parent] to adopt him and wants to stay with [her]."

¶ 14     On February 22, 2023, the trial court held a disposition hearing and found Porchia unable and unwilling to care for both M.D. and M.B.. The court held a permanency hearing the same day and entered a goal of return home within 12 months. The order stated, "[Porchia] needs time to

attempt to engage in services. Although she has not had contact with the agency and multiple referrals were made, no diligent search was performed to allow contact with [Porchia] regarding outstanding referrals. [Porchia] is visiting by phone only with [M.B.]." It said the services required by the service plan "have been provided" and DCFS has "made reasonable efforts in providing services to facilitate achievement of the permanency goal." It found that Porchia was unable to care for, protect, train or discipline her children or was unwilling to do so, that reasonable efforts had been made to prevent or eliminate the need for removal of the minor from the home, that appropriate services aimed at family preservation and family reunification had been unsuccessful, that temporary custody was terminated, and that DCFS has the right to place the minors.

¶ 15     A family service plan dated May 8, 2023, states that Porchia "has not engaged in any services." Although a caseworker provided Porchia with resources to get a psychiatric evaluation through Mt. Sinai Hospital, Porchia "has not made herself available to the agency to verify her completing a psychiatric evaluation." And although a caseworker referred Porchia to parenting classes, she "ha[d] not been engaging with the agency in order to confirm or deny if parenting classes have been completed." The plan noted that Porchia "has only phone communication with the youth" and "ha[d] not engaged in physical visits" with her children.

¶ 16     A November 17, 2023, family service plan states that Porchia "reportedly video calls her children every day to stay in touch with them and occasionally will meet with them *** when she is in Chicago." Porchia told her caseworker she lives about 1.5 hours away from Chicago in her own residence, but "would not disclose the address" to her caseworker. She reported that she did a few services remotely back in 2020, but never finished and said she is not working or currently engaged in any services. The report stated that "[i]f [Porchia] does not correct the conditions that brought this case to the attention of DCFS, [Lutheran Social Services of Illinois (LSSI)] will

explore permanency with the current caregiver." On November 30, 2023, the Court ordered LSSI to have Porchia complete a psychological assessment within 21 days.

¶ 17    On February 14, 2024, M.D.'s putative father consented to his adoption.

¶ 18    A May 16, 2024, family service plan states that Porchia "is in occasional contact with the agency. [Porchia] still reports living out of state, but refuses to disclose where she is currently living. In person visits have not been occurring due to [Porchia's] living situation. [Porchia] calls youth almost every day to talk with them." It also states that Porchia "has not engaged in any services that would correct the reasons why the case came into DCFS care. [Porchia] is not in consistent contact with the Agency, so services have not been able to occur." It noted that she had been "referred for a parenting capacity and psychological multiple times, but due to her lack of contact with Agency, and unknown location, the referrals have been denied."

¶ 19    On June 20, 2024, the court held a permanency hearing and changed M.D. and M.B.'s permanency goal to substitute care pending the termination of parental rights (TPR). The permanency order states, "[M.D.] and [M.B.] are doing well in the home of a maternal relative, where they have lived since case opening. All of their needs are being met in the home. [Porchia] has not engaged in any recommended services and will not disclose her whereabouts to the agency. She has contact with [M.D.] and [M.B.] via phone only. [M.D.] and [M.B.]'s foster parent wishes to provide permanency."

¶ 20    On August 23, 2024, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. It alleged that Porchia was unfit under ground (b) of the Adoption Act (750 ILCS 50/1(D)(b)) because she failed to maintain a reasonable degree of interest, concern or responsibility as to her children's welfare; under ground (m) because she failed to make reasonable efforts to correct the conditions which were the basis for the removal of the

children or to make reasonable progress toward the return of the children home; and under ground (p) because she was unable to discharge parental responsibilities because of mental impairment, illness, or retardation. The petition noted that M.D.'s father had already consented to M.D.'s adoption, and that it was in the best interest of the minors that they be adopted. The State later withdrew the ground (p) allegation.

¶ 21    The unfitness portion of the termination of parental rights hearing was held on February 24, 2025. At this hearing, the State asked the court to take judicial notice of the adjudication findings for both children of abuse, substantial risk of injury, neglect, and injurious environment from March 28, 2022. In addition, it asked the court to take judicial notice of its unable and unwilling findings from February 22, 2023. Finally, it asked the court to take judicial notice of the consent form signed by M.D.'s putative father, as well as the October 10, 2024, default judgment against an unknown father for M.B.. The State admitted the integrated assessment from July 2, 2020, family service plans from July 2020 – May 2024, and the psychological assessment for Porchia that was conducted by Dr. Iyamah which also includes a parenting capacity assessment. These exhibits were admitted without objection.

¶ 22    Angela Weeden testified that she was employed by LSSI as the foster care director. She was temporarily assigned to M.D.'s case for about 6 months starting around October 17, 2023. She noted that temporary custody of M.D. and M.B. was taken on November 19, 2020, due to allegations of substantial risk of injury to M.D. and that Porchia participated in an independent assessment on June 24, 2020, that was approved on July 2, 2020. The assessment contained service recommendations for Porchia, including a parenting capacity assessment, individual therapy, a psychiatric assessment, possible medication, and a substance abuse assessment. Weeden noted that Porchia had not successfully completed any of those services as of April 2024. While Weeden

admitted that "it does not appear that [Porchia] was ever referred for individual therapy", she said she "guess[ed] that [her caseworkers] were waiting on [Porchia] to receive a psychiatric evaluation and the substance abuse evaluation" before doing so. Weeden did not refer Porchia for individual therapy either because Porchia "had not completed a psychiatric evaluation." She explained that "[i]n order for [Porchia] to be ready for a referral to individual therapy, she would be in need of a substance abuse assessment." Weeden also admitted that Porchia was not referred for a psychiatric assessment until 2023 even though the psychologist recommended that she be referred for a psychiatric examination in 2020, and could not explain why it took so long to do so. However, Weeden said Porchia could not be referred to community-based services because Porchia "would not provide an address." Weeden explained that LSSI cannot refer clients to services out of state, and that its therapists "are not able to provide therapy when a client is out of state." Weeden said she could not recommend that M.D. and M.B. be returned to Porchia because she had not completed any services while she was assigned to the case.

¶ 23    Abigail Givens, another LSSI caseworker, testified that she was assigned to M.B. and M.D.'s case on May 6, 2024. Although Porchia had been assessed for services including individual therapy, a substance abuse assessment, a psychiatric evaluation, a parenting capacity assessment, and parenting classes, all services were still outstanding. Although Porchia completed a parenting capacity assessment and a psychological evaluation in 2020, it was recommended that she complete it again due to her noncompliance. Givens referred Porchia for parenting classes, but she was unable to complete that referral or a therapy referral because Porchia would not disclose her address. When Givens told Porchia that she would need her address to complete referrals for additional services, Porchia refused to provide her address and said "it was none of [Givens'] business." When Givens spoke with Porchia on May 6, 2024, and let her know what services were

still outstanding, Porchia responded that she was "completing services where she was, but then would not [disclose] where she was or what services she was completing." Givens told Porchia she would need to contact the service providers or at least provide documentation so that Givens could assess her progress in services, but Porchia "failed to provide any additional information."

¶ 24     At a family team meeting in June 2024, Givens reminded Porchia of all services that were still outstanding and again told Porchia she needed her address to refer her to services. Porchia responded that Givens "was not her caseworker and *** she *** did not need to know her address and that it was an invasion of her privacy." Givens explained that by not providing her address or any information regarding the services she was receiving, it would impede a reunification between Porchia and her children. Givens spoke with Porchia again in July 2024 and offered to refer her to services if she provided an address, but she declined to do so. Givens did a diligent search to try to figure out where Porchia was living and came up with multiple addresses, but when she spoke with Porchia to determine which address was correct, Porchia refused to tell her. If Porchia had told her that she lived in Illinois, Givens would have issued service referrals for her. However, Givens does not have the capacity to refer clients to services outside of Illinois. The last time Givens spoke to Porchia was on February 20, 2025. Givens was doing a home visit with M.B. and M.D. and Porchia was having a video call with M.B.. Givens acknowledged that Porchia had visited her children in person three times, but because she never went through the agency to set up visitation, Givens was unable to observe Porchia's visits to determine if they were safe and appropriate. She called Porchia about twice a month to try to set up visits, but Porchia did not answer her calls. The permanency goal for M.B. and M.D. was changed from return home to termination while she was case manager, and Givens explained that she recommended this change because Porchia had not participated in any services and because "[b]oth boys are happy and

10

comfortable in their placement currently. [M.D.] has expressed not wanting his mother to get her rights back and take him, and both boys want to be adopted by their great-grandma."

¶ 25    Porchia testified that she completed an evaluation with a "psychiatric doctor or something" but didn't believe she was ever referred for individual therapy. She admitted that she did parenting classes over the phone for five or six sessions but then "just, like, cut out." She said she had been living in Milwaukee for two and a half or three years, but didn't know if she ever gave the address to Givens. She admitted that she didn't complete any services in Milwaukee because "they said that they needed it to be in Illinois, and I've been waiting for them *** to let me know what it was that I was going to be doing." Porchia said she calls her kids every day, and buys them clothes and shoes and sends money "every week when [she] get[s] paid." She visited her kids in person on Thanksgiving.

¶ 26    After considering the exhibits and the testimony from the parties, the court found that the appropriate permanency goal was adoption. It noted that "[M.D.] and [M.B.] are thriving in the home of a maternal relative, where they have lived for over four years and which has been their only placement. **** Foster parent wishes to adopt and both boys wish to be adopted by their foster parent." It found that Porchia was unfit by clear and convincing evidence under grounds (b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b); (m).

¶ 27    The court then immediately proceeded to the best interest hearing. The Court took judicial notice of the evidence presented in the unfitness hearing, and then heard testimony from caseworker Givens, who testified that M.D. and M.B.'s placement with their maternal great-grandmother, Ethel, was safe and appropriate. She noted that Ethel ensures both children are available for therapy, and keeps their medical, dental, and vision up to date. She noted a bond between the boys and Ethel, and said they are comfortable going to her for their needs and wants.

Givens spoke with M.D. regarding adoption, and he told her he wants to be adopted because he feels safe with Ethel. M.B. also told Givens he wanted to be adopted by Ethel because he "likes it in the home." Finally, Givens noted that Ethel is committed to allowing the boys to continue their relationship with Porchia and with the boys' respective fathers.

¶ 28    Ethel testified next. She said that she began caring for M.D. when he was seven and M.B. when he was six months old, and that she wanted to adopt the boys if parental rights were terminated. She testified that she would continue to allow contact between Porchia and her boys.

¶ 29    Porchia testified last. Pertinent to the issues in this appeal, Porchia said she "use[s] [Ethel] for childcare to go to work," but that the boys should remain with her because "there's a bond" between them and she takes care of them.

¶ 30    Ater hearing testimony the parties, the court concluded that it was in the best interest of the minors to terminate parental rights. Porchia timely appealed.

¶ 31                                   II. ANALYSIS

¶ 32    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) outlines a two-step process for the termination of parental rights. *In re C.W.,* 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (eff. Jan. 1, 2025)). *Id.* We will reverse a trial court's unfitness finding only if it is against the manifest weight of the evidence. *In re W.N.K,,* 2025 IL App (1st) 242008, ¶ 102.

¶ 33    Once a parent is found unfit, the court must hold a hearing to determine if termination of parental rights is in the child's best interests. *In re A.R.,* 2023 IL App (1st) 220700, ¶ 77. To determine whether termination of parental rights is in the minor's best interests, the court must consider a number of factors, including the "physical safety and welfare" of the child, the child's

"sense of attachments", "the child's need for permanence," and "the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (eff. February 5, 2025). Although the court must balance these factors, its best interest determination does "not need [to] contain an explicit reference to each of these factors." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will reverse the trial court's best interest finding only if it was against the manifest weight of the evidence. *In re Julian K.,* 2012 IL App (1st) 112841, ¶ 80. A court's unfitness finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 21.

¶ 34                                  A. Unfitness Finding

¶ 35    On appeal, Porchia argues that that the evidence presented by the State was insufficient to prove that she was an "unfit person" under grounds (b) and (m) of the Adoption Act. 750 ILCS 50/1(1)(D)(b); (1)(D)(m). A parent may be found unfit under ground (b) if he or she "fail[s] to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" and under ground (m) if he or she "fail[s] to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor[.]" *Id.* "Only one of the grounds is necessary to prove that a parent is unfit." *In re Tr. A.,* 2020 IL App (2d) 200225, ¶ 43. Accordingly, we will affirm where the evidence supports an unfitness finding on any one of the grounds outlined in the Adoption Act. *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶ 20.

¶ 36    Porchia argues that the State failed to prove that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare under ground (b) because she was "consistently calling" and "video chatting" with her children on almost a daily basis, and because she purchased shoes and clothes for the children and sent money for them. However, "great

deference is afforded to the trial court's determination with respect to a finding pursuant to ground (b)." *Id.* ¶ 25. To determine whether a parent has shown a reasonable degree of interest, concern, or responsibility for a child's welfare, courts "consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest." *In re Daphnie E.,* 368 Ill. App. 3d 1052, 1064 (2006). "Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have al[so] been held to be sufficient evidence to warrant a finding of unfitness under [ground] (b)." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004); see also *In re Daphnie E.,* 368 Ill. App. 3d at 1065 ("Completion of service plan objectives can also be considered evidence of a parent's concern, interest, and responsibility."). A parent will not be deemed fit "merely because she has demonstrated some interest in or affection for her child." *Id.* at 1064. Instead, her interest, concern, or responsibility must be "objectively reasonable." *Id.*

¶ 37    We find the trial court's conclusion that Porchia was unfit under ground (b) for failing to maintain a reasonable degree of interest, concern, or responsibility for her children was not against the manifest weight of the evidence. Although the record reflects that Porchia called and video chatted with her children almost daily in 2023 and 2024, her communication with her children was sporadic during the vast majority of their time in foster care. A DCFS family service plan from April 2022 indicates that Porchia checked in with her sons' foster parent via phone only once or twice a month to see how her children were doing. In addition, Porchia had almost no in-person contact with M.D. and M.B. after they were removed from her care in April of 2020. Although a no contact order barred Porchia from visiting M.D. until October 2024, nothing prevented her from visiting M.B. during this time, yet she failed to do so. Even after the protection order was lifted, Porchia visited M.D. and M.B. only three times: once on Thanksgiving in 2024, and twice more

in February 2025, just two weeks before the termination hearing. None of these visits were supervised by DCFS, so Porchia's caseworker, Abigail Givens, could not determine if Porchia's interactions with her children were safe and appropriate. In addition, Givens' calls to Porchia in an attempt to set up supervised visits went unanswered.

¶ 38    The record also reflects that Porchia failed to demonstrate a reasonable degree of concern and responsibility for her children because she failed to complete any of the services recommended by DCFS. In July 2020, DCFS referred her to substance abuse treatment, but she was "unsuccessfully discharged" in July 2020 due to low attendance and a "lack of compliance," including a positive toxicology screen for cannabinoids. When Dr. Iyamah asked her if she planned to reengage in substance abuse treatment, Porchia said that she was "not ready to go through more drug testing and treatment," and that if she "want[s] to go out and party, [she] will." Dr. Iyamah concluded that Porchia's refusal to participate in substance abuse treatment or provide any further urine drops "suggests that she is apt to be continuing her substance use."

¶ 39    Porchia was also referred to parenting classes because of her use of corporal punishment on M.D.. Although she started parenting classes, she was ultimately dismissed from the classes due to a lack of participation. When Dr. Iyamah spoke with Porchia, Porchia admitted to "whooping" M.D. but said he "needs to be whooped" every day or he will be out of control. Based on this comment, Dr. Iyamah concluded that Porchia "harbours a belief that corporal punishment is necessary." When Dr. Iyamah asked Porchia if she would consider different ways to parent, Porchia said, "I'm not gonna listen to anything that anyone got to say."

¶ 40    DCFS also recommended a psychiatric assessment and mental health services based on Porchia's history of mental illness, as well as individual therapy. DCFS made repeated attempts to refer Porchia for these services, but because she was living out of state and repeatedly refused to

15

provide DCFS with her address, DCFS could not properly complete the referrals or connect her with service providers in her area. Even after Porchia was told that a continued failure to provide her address or any information regarding the services she was receiving would impede a reunification with her children, Porchia declined to give her caseworker her address.

¶ 41 Taken together, Porchia's limited in-person visits with her children, her unwillingness to comply with the recommended service plan, and her failure to follow through with any of the services recommended by DCFS demonstrate her lack of interest, concern, and responsibility towards her children and support the trial court's unfitness finding. See *In re Nicholas C.,* 2017 IL App (1st) 162101, ¶¶ 30-31(finding that a mother's "refusal to participate in and complete her services, her lack of interaction with her service providers, *** and her failure to maintain a regular visitation with [her children] more than sufficiently demonstrate that she has not maintained a reasonable degree of responsibility toward their welfare," reasoning that although the record reflects that the mother "loves [her children] and wants to visit them *** she cannot adequately assess their needs and put them before her own in a way that merits their return to her care as their parent"); *In re M.J.,* 314 Ill. App. 3d 649, 656-57 (2000) (affirming the trial court's unfitness finding under ground (b) despite the fact that the mother consistently attended scheduled visitations with her children because she failed to comply with the requirements of the service plan established by DCFS including failing to obtain a drug and alcohol assessment and taking prescribed medications, reasoning that "the failure to comply with the directives of a service plan with the stated goal of returning a child home is tantamount to objectively unreasonable interest, concern, or responsibility for the child's welfare").

¶ 42 Because the trial court's unfitness finding under ground (b) is sufficiently supported by the record, we need not address Porchia's argument about unfitness ground (m). See *In re Tiffany M*.,

353 Ill. App. 3d 883, 891 (2004) ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court.")

¶ 43                                    B. Best Interest Finding

¶ 44    Porchia does not challenge the trial court's best interest finding on appeal, so we need not review the court's determination that termination was in M.D.'s and M.B.'s best interests. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26 (declining to review the trial court's unfitness finding when the respondent failed to challenge it on appeal); *In re D.P.,* 2024 IL App (1st) 231530, ¶ 28 (finding that respondent "has forfeited any argument that the trial court's best interest ruling was against the manifest weight of the evidence" because he did not challenge it on appeal and declining to "discuss that finding any further").

¶ 45                                    III. CONCLUSION

¶ 46    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 47    Affirmed.